COURT OF APPEALS,

July 14, 1914.

# THE PEOPLE v. ENG HING AND LEE DOCK.

## (212 N. Y. 373.)

(1.) MURDER—VALUE OF TESTIMONY OF DEGRADED WITNESSES QUESTION FOR JURY.

The value of testimony of witnesses of a degraded character, in behalf of the prosecution, on a trial for murder, is for the consideration of the jury quite as much as any other, and when it is submitted under proper instructions it is conclusive upon this court, unless it is inherently improbable or clearly against the weight of other more credible evidence.

(2.) SAME—ISSUES BETWEEN WITNESSES FOR PROSECUTION AND FOR DEFENDANT QUESTIONS FOR JURY.

Evidence offered on behalf of the prosecution, on trial for murder, identifying the defendants as the men who committed the crime and evidence offered on behalf of defendants to establish an alibi, examined, and *held*, that the issues between the various witnesses were for the jury.

(3.) SAME—TESTIMONY AS TO IDENTIFICATION.

After the jury had retired for deliberation they returned to the court room and asked the following question: " Were both defendants identified at the hospital by the man who died, Lee Kay?" The court, *with the consent of counsel,* responded: " There is testimony that both defendants were brought into the presence of Lee Kay; that Lee Kay said something in their presence. At the suggestion of the court the district attorney did not press for an answer to the question as to what Lee Kay then said. You may retire." It is said that this episode supports the inference that the jury were impressed with the belief that Lee Kay's statements were of cogent force in determining the issue of identity. *Held,* upon consideration and in view of what was actually shown at the trial in regard to the so-called identification, which ended with a

declaration by both defendants that they did not hear, or did not understand, what may have been said by Lee Kay, and in view of the very definite statement that the district attorney " did not press for an answer as to what Lee Kay then said," that neither the letter nor the spirit of the testimony under this head requires a reversal of the judgment.

**(4.) SAME.**

Immediately after the murder one of the defendants was shot by one of two men who pursued the supposed murderers and who were both arrested. It is contended that it was error to exclude certain evidence as to what took place in the Magistrate's Court on their arraignment for the shooting. *Held*, upon examination of the questions asked, that they are so irrelevant to the issues on this trial that the exceptions to the rulings of the court sustaining objections thereto are plainly without merit.

**(5.) SAME—WHEN AFFIDAVITS IMPEACHING WITNESSES FOR PROSECUTION NOT SUFFICIENT TO WARRANT GRANTING NEW TRIAL ON GROUND OF NEWLY DISCOVERED EVIDENCE.**

Affidavits used on a motion for a new trial examined, and *held*, that the defendants have produced nothing new or substantive that would probably have changed the verdict if it had been produced at the trial. The whole proceeding was an effort to impeach certain witnesses, and that is not a sufficient reason for granting a new trial on the ground of newly-discovered evidence, even where the impeachment is successful.

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York, rendered February 14, 1913, upon a verdict convicting the defendants of the crime of murder in the first degree.

The facts, so far as material, are stated in the oinion.

*Terence J. McManus* and *Charles W. Gould* for appellants. The motion for a new trial should have been granted. (*Barrett v. T. A. R. R. Co.*, 45 N. Y. 628; People v. Fletcher, 35 Misc. Rep. 783; People v. Benham, 30 Misc. Rep. 466; People v. Lane, 31 Hun, 13; Kring v. N. Y. C. R. R. Co., 45 App. Div. 373; People v. Glasgow, 52 N. Y. Supp. 24.)

*Charles S. Whitman, District Attorney (Robert C. Taylor* of counsel), for respondent. Conceding that the Chinese witnesses for the People, and the white women who consorted with men of their race, are of a low order, the credibility of their evidence is for a jury to decide. (People v. Seidenshner, 210 N. Y. 341; People v. Driscoll, 107 N. Y. 414; People v. Mooney, 178 N. Y. 91; People v. Katz, 154 App. Div. 44; 209 N. Y. 311; People v. Rodawald, 177 N. Y. 408.) Where one set of witnesses has testified to one state of facts and another set to another state of facts in irreconcilable conflict, the trial judge is bound to submit the issue to the jury. (People v. Poulin, 207 N. Y. 73; People v. Katz, 154 App. Div. 44; People v. Egnor, 175 N. Y. 419.) The motion for a new trial was properly denied. (People v. Smiler, 8 N. Y. Cr. Rep. 124; People v. Priori, 164 N. Y. 459; People v. Patrick, 182 N. Y. 131; People v. Buchanan, 145 N. Y. 1; People v. Koepping, 178 N. Y. 247; People v. Bonifacio, 190 N. Y. 150.)

WERNER, J.:

The defendants have been convicted of murder in the first degree. The charge is that on the 27th day of February, 1912, between 7 and 8 o'clock, they shot Lee Kay while he was in a small store known as No. 18 Mott street, in the borough of Manhattan, city of New York, and inflicted upon him a wound from which he died on the 10th day of June in the same year. The defendants have been twice tried. On the first trial the jury disagreed, and on the second trial the defendants were convicted. From the judgment entered upon the verdict rendered on the second trial the defendants have appealed to this court.

The shooting took place in the store of Lee Po Ming, and there were present Lee Po Ming, who was seated behind a counter at the rear end of the store; two Chinamen, named Lai Look and Hom Chung, who sat on a box and stool, respectively,

on the southerly side of the store, about opposite the end of the counter; and Lee Kay, the deceased, who sat on a fruit box in front of the counter reading a newsaper. According to the witnesses, Ming, Chung and Look, the defendants came to the front door of the store, and immediately began to discharge their revolvers, firing four or five shots, two of which lodged in the body of Kay, one penetrating the left arm a little above the elbow, and another the left side of the back below the shoulder blade, going in toward the median line and stopping at the ninth dorsal vertebra. That there were a number of shots fired is amply demonstrated by the physical conditions discovered after the shooting. Two separate bullets had entered the body of Kay. Three bullet holes were found in the fruit box on which he had been sitting. Another bullet lodged in a clock which hung on the rear partition wall of the store. At the opening of the fusilade Ming got down behind the counter, while Chung and Look ran through a door leading to a room in the rear of the store where there were four Chinamen named Li Fong, Frank Yee, Lee You and Yung Hoy. Two of these, Fong and Yee, seized revolvers and started in pursuit of the defendants who were then running along Mott street toward an arcade which connects Mott street and Doyers street.

In addition to Ming, Chung and Look, there were three other persons who witnessed the shooting from the outside of the store. These were Florence Wong, Grace Mack, white women who lived with Chinamen, and a Chinaman named Lai Hay, who resided in Ossining, but was then celebrating the Chinese New Year in the city of New York. The two women were on their way from their appartments to a restaurant in No. 14 Mott street. As they reached the middle of the street they heard shots at No. 18. Looking in that direction they saw the defendants shooting into the store and then watched them as they ran toward the arcade. According to Florence

Wong both of the defendants had pistols in their hands as they ran, and one of them threw his away. The Chinaman Lai Hay testified that he was standing in front of No. 17 Mott street when he heard shots at No. 18; that he saw the defendants shooting into the store, and that they then ran to the arcade; that when they got to No. 20 Mott street the defendant Eng Hing threw away a pistol. Li Fong and Frank Yee, the two Chinamen who gave chase to the defendants, testified that when they reached the sidewalk they saw two Chinamen, whom they recognized as the defendants, running toward the arcade, and that when the defendants had retreated into the arcade there was an exchange of shots between the defendants on the one side, and Li Fong and Frank Yee on the other.

Cuneen, a police officer whose post was on Pell and Doyers streets, stood at Mott and Pell streets when he heard a number of pistol shots. He ran in the direction from which the sounds came and, as he approached No. 20 Mott street, he saw two Chinamen firing into the arcade. The Chinamen stopped shooting when they saw the officer coming and ran into the hallway of No. 18 Mott street where Frank Yee was found hiding in an area on the further side of a wall which separates No. 18 Mott street from No. 16, and the officer placed him under arrest. Wade, another police officer, was with Cuneen when the shooting was heard. He saw two Chinamen run from the Mott street entrance to the arcade into the hallway of No. 18 Mott street, where he found Li Fong and placed him under arrest. Within the arcade, about midway between Mott street and Doyers street, there was one George Sullivan, who was passing through. He saw two men running; he heard shooting, and he saw the defendant Eng Hing fall after the shooting. That the defendant Eng Hing was in the arcade, and that there he was shot in the thigh, is admitted by him. Supplementing all the testimony for the prosecution, of which the foregoing statement

is a bare skeleton, there is the ante-morten statement of Lee Kay, received in evidence by consent of counsel for the defendants, in which the declarant says: "On February 27th, 1912, at 8:45 P. M., this fellow shot me. Lee Dock and Eng Hing was the two. Lee Dock shot me. Lee Dock was brought here and identified by me as the man who shot me at 18 Mott street. I was sitting in the store and Lee Dock came to the door and shot me."

The defense is a general denial by both defendants, supplemented by testimony designed to prove an alibi as to each of them. The defendant Lee Dock testified that on the evening of February 27th, 1912, between 7 and 9:30 o'clock in the evening, he was in his room on the third floor of No. 33 Allen street; that this was an apartment maintained by William McGann; that McGann and Martin Schauer were present with him during the whole of that time; that shortly before ten o'clock he left the apartment to go to a restaurant at No. 11 Pell sreet to get something to eat, and that while he was in this restaurant he was placed under arrest by Detective Kennell. This defendant was corroborated by McGann, who testified that he was in the apartment with Dock and Schauer; that shortly before eight o'clock he, McGann, went out to get some coffee and cake; that on this trip he went to the arcade, and while there he heard the shooting; that after making his purchases he returned to the apartment and related to Dock and Schauer what he had witnessed in Mott street, and that Dock remained in the apartment until half-past nine o'clock when he went out. Schauer corroborated Dock and McGann, and stated that he and Dock were constantly in the room together until half-past nine, when the latter went out.

The defendant Eng Hing testified that on the evening of February 27th, 1912, he lived at No. 12 Pell street with Yow Yue and Eng On; that at about eight o'clock he left his room

for the home of his cousin Wan Wah to get a letter; that on his way he went through the arcade, and as he neared the Mott street entrance he heard shots; that he became frightened, turned and ran in the direction of Doyers street, and while thus seeking to escape he received a bullet wound in the thigh; that when he became convinced that he was being pursued by two men he turned and said: "Brethren, I don't belong to any society, don't strike me;" that he afterwards identified these two men as Li Fong and Frank Yee; and that when he was discharged from the hospital he was arraigned for the murder of Lee Kay and remanded to the Tombs prison.

Albert Donnelly, a driver who resided at 15 Franklin street, testified that in the evening of the shooting he stood at the corner of Mott and Park streets nearly opposite the Mott street entrance to the arcade, and that he heard shooting; that he saw one Chinaman come down from the arcade to the foot of the stairs and immediately turn back, while, in the same instant, two Chinamen came down the street and began firing into the arcade.

Edward Kadin, in the business of delivering newspapers, testified that at about eight o'clock in the evening of February 27th, he was walking on Mott street from Chatham Square to Pell street; that as he approached 18 Mott street he heard shots; that he saw a Chinaman come out of the arcade and immediately turn back, and at the same time two Chinamen ran into the arcade and fired shots.

Eng Hue Yuen testified that the defendant Eng Hing lived with him at No. 12 Pell street, and that he saw the latter leaving the room at about eight o'clock, without any pistol on his person.

The foregoing outline presents merely the essential features of a trial singularly free from errors and questions of law. The record, from beginning to end, discloses in greater amplitude of detail an issue of fact upon which the verdict is conclusive

unless we can say that it is against the weight of the evidence, or contrary to law, or that justice requires a new trial. We shall first consider the record of the trial, and then separately discuss the merits of the application for a new trial on the ground of newly-discovered evidence.

The first and most important fact in the consideration of this appeal is that there were six eye witnesses to the shooting which resulted in the wounding and ultimate death of Lee Kay. These were Lee Po Ming, Hom Chung and Lai Look who were inside of the store; and Florence Wong, Grace Mack and Lai Hay who were in the street. All of the witnesses positively identified the defendants as the men who did the shooting. Then there is the testimony of Li Fong and Frank Yee who were in the room back of the store, and who rushed out in pursuit of two Chinamen running toward the arcade and whom they identified as the defendants. This is supplemented by the conceded fact that the defendant Eng Hing was in the arcade immediately after the shooting in No. 18 Mott street, and that while there he was shot by Li Fong or Frank Yee. The fact that Eng Hing was shot is admitted by him and testified to by Sullivan, and the evidence clearly identifies his assailants as Li Fong and Frank Yee. The story of the police officers, Cuneen and Wade, fully coincides with the statements of these two Chinamen regarding the occurrences in the arcade. All this evidence is so direct and convincing and consistent that there can be no doubt as to the duty of the jury in the premises, unless doubt is to be sought in the degraded character of some of the witnesses. The answer to this suggestion is found in the very recent case of People v. Seidenshner (210 N. Y. 358, 359) Where Judge CHASE had occasion to discuss for this court the character of witnesses by whose testimony the commission of the crime of murder was established. It was there very aptly pointed out that crimes are usually committed by those who are

properly designated as criminals, and who consort with their own kind in surroundings where persons of undoubted veracity and respectability are rarely found, and then only by chance. The moral of the discussion was that the value of such testimony is for the consideration of the jury quite as much as any other; and that when it is submitted under proper instructions it is conclusive upon this court, unless it is inherently improbable, or clearly against the weight of other more credible evidence. There is nothing intrinsically improbable in the stories told by the various witnesses for the prosecution; on the contrary, they appear to be so direct, and so consistent with various conceded facts, that the issue was clearly for the jury. In such circumstances " it would be hazardous for seven judges of the law, * * * to say that the twelve judges of the fact were wrong." (People v. Ferraro, 161 N. Y. 365, 377, 14 N. Y. Crim. 266.)

What is there of the defense? As to the defendant Eng Hing it rests wholly upon his explanation of the reason for his presence in the arcade just after the shooting in No. 18 Mott street. He testified that he left his apartment in Pell street at about eight o'clock, and that the purpose of his leaving was to go to the home of a cousin in Mott street to get a letter. As to the time of his departure from the apartment he is corroborated by the witness Eng Hue Yuen. In every other particular his story is without corroboration, for the witnesses Donnelly and Kadin did not identify any of the Chinamen who figured in the occurrence in the arcade, and the story of Sullivan is quite as consistent with the theory of the prosecution as with the claim of this defendant. There is in this story of Eng Hing nothing inherently more probable than the story told by the eight witnesses for the prosecution, and, in any event, it presented a simple question of fact for the jury.

The *alibi* sought to be established for the defendant Lee

Dock also involves a plain issue of fact.  His testimony,
as corroborated by McGann and Schauer, tended to show that
he could not have been at the scene of the shooting.  McGann
and Schauer were not Chinamen and the jury might have
found in their testimony elements of verity not to be looked for
in the testimony of interested Chinese witnesses; but it is equally
possible that their acknowledged association with the Chinese
may have detracted from the weight which their narrations
might otherwise have had.  And here again our observations
lead us to the conclusion that the issue between the various wit-
nesses was one for the jury.  Upon the features of the trial
thus far discussed it remains but to add that the case was sub-
mitted upon a charge of admirable clearness and impartiality, to
which no exceptions were taken and in respect of which no re-
quests were made.     ⋄

We now come to an incident of the trial which the dissent-
ing members of the court regard as a sufficient ground for the
reversal of the judgment of conviction.  The record discloses
that after the jury had retired for deliberation they returned
to the court room and asked the following question:  " Were
both defendants identified at the hospital by the man who died,
Lee Kay?"  The court, *with the consent of counsel,* responded:
" There is testimony that both defendants were brought into
the presence of Lee Kay; that Lee Kay said something in their
presence.  At the suggestion of the court the district attorney
did not press for an answer to the question as to what Lee
Kay then said.  You may retire."  It is said that this episode
supports the inference that the jury were impressed with the
belief that Lee Kay's statements were of cogent force in determ-
ining the issue of identity.  We cannot assent to this suggestion.
In our view of the case the issue of identity was not doubtful.
The evidence of six witnesses upon that issue was direct and
positive.  This was corroborated by the testimony of two others

and by circumstances which have already been discussed. If the jury placed any reliance upon this testimony, as we must assume they did, the identity of the defendants was as fully established as the shooting of Lee Kay. Let us assume, however, that some one or more of the jury had been impressed with the statements made by Lee Kay when he saw the defendants. What could have more effectually dissipated that impression than the course pursued by the court with the consent of counsel? The jury were plainly told that Lee Kay said something, but, "at the suggestion of the court the district attorney did not press for an answer to the question as to what Lee Kay then said." What could have more clearly informed the jury that they were not to consider what Lee Kay said? It was as though the court had said, in so many words, "the statement of Lee Kay was not satisfactory, and was made under such circumstances that you are not to consider it at all." And in this connection it will be useful to consider what had actually been shown at the trial in regard to Lee Kay's so-called identification of the defendants at the hospital. The defendant Eng Hing was being cross-examined by the assistant district attorney. In the course of that examination he was asked if he had been taken to the room where Lee Kay then was, and he answered in the affirmative. After some objections by defendants' counsel and some remarks by the court, the assistant district attorney asked this defendant: "Is it not a fact that while you were right next to his bed in the Hudson Street Hospital that he said 'That is the man that shot into the store; Lee Dock shot me?' and the defendant Eng Hing answered, 'I did not hear it. I did not hear that at all.' And again, 'Did you hear Lee Kay say anything?' to which the reply was, 'When he talked in English I did not understand it.'" On the cross-examination of Lee Dock the assistant district attorney asked him the following questions: "Q. Did Lee Kay say to you

' you son of a bitch, why did you shoot me? ' A. ' When the police officer had put me by the bed I was excited; *I did not hear what he said.* I knew I was arrested but I was excited.' Q. ' Lee Kay spoke in pidgeon English didn't he? ' A.' ' I don't know; I did not hear.' " Assuming that it was technical error for the trial court to overrule the objections to these questions, we should not overlook the outcome of this episode of the trial. It ended with a declaration by both defendants that they did not hear, or did not understand, what may have been said by Lee Kay. In this view of the matter, how can we say that it was harmful to the defendants? Our duty under the statute (Code Crim. Pro. section 542) is not less compelling than our power. (Section 528.) We have the power to order a new trial if we are satisfied that the verdict is against the weight of evidence, or against law, or when justice requires it, but it is also our duty to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. In the interests of justice we must assume that the jury in this case was composed of men of average intelligence. In view of the negative statements of the defendants as to what occurred at the hospital when they were taken to the bedside of Lee Kay, and of the very definite statement that the district attorney " did not press for an answer as to what Lee Kay then said," we think it may safely be held that neither the letter nor the spirit of the testimony under this head requires a reversal of this judgment.

Defendants' counsel contends that it was error to exclude certain evidence as to what took place in the Magistrate's Court in which Li Fong and Frank Yee had been arraigned for the shooting of Eng Hing. In the case at bar Li Fong was a witness for the prosecution. On his cross-examination he had been interrogated, without objection, as to various phases of the proceedings in the Magistrate's Court. He was then asked:

" Now you were in court when Judge Curtis said, ' These two people (indicating the defendants) were in that store where these two assassins were dispatching Lee Kay? ' " The objection to this question was sustained and defendants' counsel took an exception.   And again, Q. " At any time during the course of that examination did your counsel say, or ask any questions, in which he stated that you had pursued these men with a pistol as these men went through the Arcade? " This was also excluded. There were other questions along the same line and similar rulings.   It is to be noted that these questions relate to statements made by Judge Curtis as prosecuting counsel in the proceeding in the Magistrate's Court against Li Fong and Frank Yee, and to other matters connected with that proceeding. They seem to have been asked for the purpose of showing what Judge Curtis had said and what the counsel for Li Fong and Frank Yee omitted to say in the conduct of the examination. All this was so irrelevant to the issues on this trial that the exceptions to the rulings of the court are plainly without merit.

The motion for a new trial is remarkable more for the unusual methods by which new evidence was sought than for the results achieved.   The affidavits used on the motion fill a separate volume of no mean size.   It would be impossible to discuss in detail the averments of these voluminous papers, and we shall attempt no more than to state the substance.   The trial court denied the motion after a hearing which seems to have been conducted with praiseworthy deliberation and care; and it is to be noted that after the hearing upon the affidavits it was deemed unnecessary to exercise the power to call the witnesses before the court for further examination.   (Code Crim. Pro. sec. 465, subd. 7.)

The obvious purpose of the motion was to discredit the testimony of the two women, Florence Wong and Grace Mack.   In view of that fact it will be well to have in mind the provisions

of the statute (Code Crim. Pro. section 465) regulating the practice on such motions, and the decisions of this court on the subject. The only part of the section that is germane to this discussion is subdivision seven, which provides that a new trial may be ordered, " When it is made to appear, by affidavit, that upon another trial, the defendant can produce evidence such as, if before received would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence. The court in such cases can, however, compel the personal appearance of the affiants before it for the purposes of their personal examination and cross-examination, under oath, upon the contents of the affidavits which they subscribed." This court has said (per MARTIN, J.) that a motion for a new trial, on the ground of newly-discovered evidence, should not be granted if the evidence is " merely impeaching or contradicting the former evidence." (People v. Priori, 164 N. Y. 459, 472, 15 N. Y. Crim. 194; and to the same effect see People v. Patrick, 182 N. Y. 131, 179, 19 N. Y. Crim. 136.)

The moving papers disclose that counsel for the defense employed one Thomas F. Cassidy, an investigator, to find evidence to prove the falsity of the testimony given at the trial by Florence Wong and Grace Mack. The efforts made in this behalf may be conveniently divided into two distinct parts. 1. The work done in the city of New York by Cassidy and his assistants. 2. The effort assigned to Hazel Trueman in the city of Philadelphia. As to the proceedings in New York it appears that Frank Treglia, alias " Rubber," was a well-known character in Chinatown, who had been called as a witness for the prosecution on the first trial of the defendants, but was not called on the second trial. Acting upon the assumption that Treglia had some knowledge of the connection of the two women, Wong and Mack, with the case, it was arranged that a slumming ex-

pedition should be organized in which the services of Treglia were to be utilized in seeing the sights of Chinatown, and this was to be followed by a visit to a furnished apartment, procured for the occasion, at 517 West 134th street, which had been equipped with a dictograph, connecting two rooms, and with an opium-smoking outfit in the room to be used by the visitors. Treglia was engaged, the slumming party went to Chinatown and later to the apartment in 134th street. Two stenographers were stationed in a room with the " receiving end of the dictograph." Treglia and a man named Carette and two women composed the party in the room where " the transmitter " of the dictograph had been installed. These two women left at some time during the night, and two others were substituted; and just here it is important to note that neither Florence Wong nor Grace Mack were there. Treglia claimed to have a severe toothache, and he appears to have made this the excuse for his liberal indulgence in intoxicants. He also smoked opium at frequent intervals during the night. Meanwhile the dictograph was recording the phantasm of this drunken and stupified wretch, who was being more or less skillfully led on by the questions and suggestions of Carette and the women. This part of the record must be read to be appreciated. Eliminating all that is plainly irrelevant or imaginary, much of the conversation is so confused that it is impossible to say whether the references to the shooting in Chinatown related to the case of these defendants or to the case of Jung Hing, who was convicted of another murder. Treglia spoke of two women who had been witnesses, and in this connection he mentioned Mabel Fitch and Katie Earl, who were witnesses in Jung Hing's case. Sometimes he referred to a " Chinaman " in the singular and again to " Chinamen " in the plural. Thus the disconnected story was spun out until the very end of the affidavit of stenographer Murray, when there is finally something that may be

said to be tangible. The dictograph records the voice of a woman. "I am getting right sleepy." Rubber: "When they vote and the women are suffragettes"—A woman: "What became of"—Rubber: "She is dead and buried." A woman: "I know Florence. This is another case in—What about"—Carette: "You are thinking of Gracie Mack." A woman: "Who is she?" Rubber: "She has lived there for three years." A woman: "Did she not testify against the Chinamen?" Rubber: "Yes. There were three of them, you know, for the prosecution; she and a girl there named Florence Wong. They were the ones who sent these two Chinamen up, and who testified against them for shooting in the Arcade. I got them for witnesses. They were going to Philadelphia, you see; her mother was dead, and she takes this other girl, Gracie, a friend across the street, to visit there. They lived in 17, and that is right opposite, across the street, and this girl was with her, and when they got to the middle of the street the shots were fired. If it hadn't been for the two girls the little fellow could have got away; the women were right in the middle of the street, with every one there, and couldn't move. So this Grace Mack got away to Philadelphia and the other girl kept here quiet. At the Coroner's court they did not appear, but we got them here at the trial; I did not mention them until then." A woman: "Did they see the shooting?" Rubber: "They didn't like to go down; they would be ripped up for being with Chinamen, and all that; but we got them on the stand."

In all this long dialogue, carried on between persons sodden with drink and drug, the passages just quoted are the only ones that plainly refer to the case of these defendants, and we find in them nothing that conflicts with the testimony given at the trial. We may safely go further, indeed, and say that if effect is to be given to any of the conversation, this latter part is obviously much more pertinent, coherent and intelligible than

anything that preceded it.   The affidavit of Murray, the stenog-
rapher, is corroborated by his colleague, Harris, and there
are the affidavits of Carette, the paid investigator, and of Cur-
ran, his assistant, which attribute to Treglia various statements
indicating that he had asserted or admitted that the women,
Florence Wong and Grace Mack, had not witnessed the shoot-
ing, and that he had suborned them to appear at the trial.   The
averments of these affidavits are flatly denied by the affidavits of
Florence Wong, Grace Mack and Treglia.   It is to be observed,
in passing, that there are no affidavits by the women who are
said to have taken part in the symposium at 134th street.

Two other affidavits, of Snow and Kearney, the stenograph-
ers who were at the receiving end of the dictographers who were
at the receiving end of the dictograph which had been installed in
apartment No. 9 in No. 17 Mott street, purport to set forth a
conversation between a man, evidently a Chinaman, and a
woman whom he addressed as Gracie.   At a certain stage of this
conversation the dictograph recorded the closing of the door,
and this was followed by a woman's voice calling " Flossie come
up, I want to see you."   It does not appear that " Flossie "
responded to the call, except as that may be inferred from the
dialogue which followed.   It began thus : " Say Flossie, I wonder
how they know about that room.   What did that girl say to
you in Philadelphia? "   The response is apparently made by
" Flossie," although there is nothing to indicate it except the
context.   " She sent for me to come around to a restaurant.
She said she had a note from a friend of mine in New York.
When I saw her she asked me if I was Flossie Wong, and I said
I was.   She handed me a note from Little Chink, and asked me
to get her some hop and she said she would do me a favor.   She
told me how Rubber was shooting off his mouth, how smart he
was, and how you and me and Jim Gun and he were down
stairs, and he told us how to testify.   Somebody must have

talked and you say you didn't, so who in hell did. It must have been that Rubber. Gee, if they found that out they will easily find out that I was in the pictures—are liable to get in trouble. Gee, I wish I hadn't let Rubber in that room that day, for I knew damm well he couldn't keep his mouth shut, and besides my Chink didn't want me to go and be a witness, for the last words he said were I would get in trouble."

Here "Gracie" seems to have interpolated: "Oh don't lose your nerve. Nobody has got anything on us. What the hell—we have the district attorney back of us, ain't we?"

And "Flossie" responded: "Yes, but you know them chinks will spend money and they ain't dead yet, and that McManus is a son of a bitch and a smart bastard. I am going down stairs now, and I will see Little Chink to-night, but he won't talk to me, he always walks away when I come near him. When I hear anything I will let you know. Good-bye Gracie."

"So long."

The two women, Florence Wong and Grace Mack, made affidavits containing categorical denials of any such conversation.

The occurrences in Philadelphia are set forth in the affidavits of Snow and Kearney, the stenographers, and of a woman named Hazel Trueman. According to the averments of this woman, she had formerly been an habitué of Chinatown, but at the time of making her affidavit she resided in Springfield, Massachusetts. She had been retained by Cassidy to go to Philadelphia to assist in getting evidence for a new trial. A room had been hired at No. 210 North 10th street in Philadelphia, to which she went, and there met Snow and Kearney. Acting upon information that the Wong woman was in the habit of frequenting a restaurant at the corner of 10th and Winter streets, the stenographers and Trueman went there and waited for her from four o'clock of one afternoon until seven in the evening. She did not appear, and so a note was sent to her asking her to come to the

restaurant.  When she finally came in, Trueman was seated
at one table and Kearney at another.  She asked them:
" Do you know what girl sent for me? "  To which Trueman
replied: " I am the girl who sent for you, I know you, but you
don't know me.  Little Chink gave me this letter to give to
you."  A letter was handed to Florence Wong.  The two women
talked awhile when Trueman said: " I am going to tip you off
to something.  It is none of my business, but a week ago last
Sunday Rubber and Little Chink and I and my friend went on
an excursion.  We were all seated at a table drinking and
Rubber commenced bragging what a wise guy he was.  He
said that he and Jim Gun went into room 8, 17 Mott street,
and told you and Gracie Mack what to say to send those two
Chinamen up to Sing Sing to the chair."  The affidavit of
Trueman goes on to say that she asked Wong if she knew
Rubber and that Wong looked up at her and turned white,
trembled for a second and said:  " Why Rubber worked for
the society."  To which Trueman replied: " I know it, he
makes $20 a week."  The Trueman affidavit further attributes
to Florence Wong the following. statement: " Well, you know
those two Chinks ain't dead yet and I have to be careful.  If
Rubber does not stop talking he will put us all in jail."
These statements are corroborated by Kearney.  The affidavit
of Florence Wong admits the meeting in Philadelphia, but
gives an entirely different version of it.  She says that she went
into this restaurant and asked a man of her acquaintance
whether he knew who had sent for her; that thereupon True-
man introduced herself as Helen, and replied: " I am the one
that sent for you, I want to talk with you; " that they then sat
down at a table, when Trueman produced a note supposed to
have been written by a New York Chinaman known as Little
Chink; that Wong asked Trueman: " What do you want of
me? " and Trueman said that she had the opium habit and

wanted a place to smoke; that Wong replied she did not smoke herself now, that it was awfully strict in Philadelphia, and that she could not take her to any place; that Trueman then stated that she had a layout in a dress-suit case, and if the hop could be procured, she would go to a hotel and smoke, that Trueman produced money, and Wong tried to find a Chinaman to send after the opium, and in the interval Trueman asked Wong if she knew Rubber, to which Wong replied in the affirmative; that Trueman then said: "Well, when you go back to New York, you ought to see him because he gave you an awful roast at a picnic a week ago Sunday, and Little Chink had a fight with him on account of it;" that Wong asked: "What did he give me a roast for?" and Trueman replied: "For being in the trial, you and Grace Mack;" that Wong then said: "Well, when I go back, I will see what he can say about me." Although Florence Wong does not deny categorically the statements of Trueman and Kearney as to the Philadelphia interview, her account of it is radically different from theirs.

From the foregoing synopsis of the affidavits used on the motion for a new trial it is apparent that the defendants have produced nothing new or substantive that would probably have changed the verdict if it had been produced at the trial. The whole proceeding, from beginning to end, was simply an effort to impeach the witnesses Florence Wong and Grace Mack; and that, as we have seen, is not a sufficient reason for granting a new trial on the ground of newly-discovered evidence, even where the impeachment is successful.

For the foreging reasons the judgment of conviction herein should be affirmed, and the motion for a new trial be denied.

CHASE, COLLIN and CUDDEBACK, JJ., concur; HOGAN and CARDOZO, JJ., dissent; WILLARD BARTLETT, Ch. J., not voting.

Judgment of conviction affirmed.