COURT OF GENERAL SESSIONS—NEW YORK,

Oct., 1914.

## THE PEOPLE v. ENG HING AND LEE DOCK.

NEW TRIAL *—NEWLY DISCOVERED EVIDENCE—CODE CRIMINAL PROCEDURE
    SEC. 465.
    Where the suggested new evidence merely impeaches or con-
    tradicts the former evidence of certain witnesses introduced by
    the People—and so weaken the People's case by subtraction rather
    than strengthen defendants' case by addition—it will not justify a
    new trial when the People's case remains supported by the con-
    curring and except for alibi evidence uncontradicted testimony of
    three unimpeached alleged eye witnesses.

*Hon. Charles S. Whitman, District Attorney (Isidor Was-
servogel and John M. Minton, Esqs., Assistant District Attor-
neys, of counsel), for the People.*

*Moss, Marcus & Wels (Frank Morse and Samuel Marcus,
Esqs., of counsel), for the defendants.*

CRAIN, J.:

The defendants move under subdivision 7 of section 465 of
the Code of Criminal Procedure for a new trial. They were in-
dicted charged with the murder of one Lee Kay. They have
been twice tried. On the first trial the jury disagreed. On the
second trial they were convicted of murder in the first degree.

After conviction they moved under the subdivision of the sec-
tion mentioned for a new trial. This motion was denied. The
defendants appealed from the judgment of conviction and from
the order denying the motion so made by them for a new trial.

* See Notes, Vol. 14, 394; 21, 127.

The judgment of conviction was affirmed, as was also the order denying their motion for a new trial. After such affirmances upon an affidavit submitted to the Governor of the State they were accorded a reprieve in order that they might make on additional affidavits this second application for a new trial. The time is now fixed for the electrocution of these defendants. The decision reached upon this motion is not appealable. If denied, their death sentence will be executed unless they obtain executive clemency. Their lives may therefore be said to depend upon whether this motion is granted or denied. For this reason the decision of the motion has been approached with a consciousness of the responsibility involved.

The court has heard on behalf of the moving parties an extended oral statement. It has received and carefully examined the numerous affidavits filed in support and in opposition. It has listened and with a view to the better ascertainment of the truth participated in and conducted a full and lengthy examination of most of the affiants. It has by consent and stipulation caused others than the affiants to be questioned, and it has sought in the interests of justice to relax the rules of legal evidence not merely for the purpose of informing itself of every ground upon which any person claimed to infer the innocence of either defendant, but that such data might be available in convenient form to these defendants if the motion were denied and they made application for executive clemency. It has received and examined with care the able briefs filed in support and in opposition to the motion, and it has determined not to permit any narrow or strict construction of the statute or any narrow interpretation of any decision to stand in the way of the granting of the motion if in the light of the record upon the trial and the proceedings and evidence upon the motion in good conscience it should be granted, and this opinion is written as it is so as not to unduly handicap these defendants should they apply for executive clemency; but contrariwise so as to

state at least some of the considerations which have caused hesitancy in denying the motion.

On February 27, 1912, between 7 and 8 o'clock in the evening, one Lee Kay received a pistol shot wound while in the small store of Lee Po Ming on the ground floor of No. 18 Mott street, in the County of New York. From such wound he died on June 10, 1912. Within a few minutes of the shooting, the defendant Eng Hing was found lying wounded upon the floor of what was known as the Arcade, a passageway extending from No. 20 Mott street to No. 11 Doyers street, and was conveyed in an ambulance under arrest to a hospital. At about 10 o'clock on the evening of the shooting the defendant Lee Dock was placed under arrest by Detective Officer Kennell immediately after Lee Dock's entrance into a restaurant at No. 11 Pell street.

Upon the second trial four Chinamen and two white women living with Chinamen testified for the prosecution that they had seen the shooting and that it was done by the defendants. These Chinamen were Lee Po Ming, vice-president of the On Leon Tong Society; Hom Chong, a member of that society and an employee of a firm of which Lee Po Ming was a member; Li Look, an acquaintance for ten years of Lee Po Ming and an acquaintance for some time of Hom Chong, but not a member of the On Leon Tong Society, and Lai Hay, an acquaintance of Lee Po Ming, but one not shown to have been connected with the On Leon Tong Society. Lee Po Ming, Hom Chong and Li Look testified that they were in the store with Lee Kay when Lee Kay was shot. Lai Hay swore that he saw the shooting from the doorway of No. 17 Mott street. The women witnesses were Grace Mack and Florence Wong. They testified in substance that they saw the shooting from a point in the centre of Mott street between Nos. 16 and 18. Two Chinamen, namely, Frank Yee, sometimes called Frank Yee Gow, a member of the On Leon Tong Society and an acquaintance at the time of Grace Mack and the person with whom she was living at the

time of the trial, and Li Fong, not a member of the On Leon Tong Society, but an acquaintance of Jim Gum, an officer of that society, testified that they had seen the defendants immediately after the shooting in flight running to and entering into the arcade referred to.

Thus on the trial three witnesses, namely, Lee Po Ming, Hom Chong and Li Look, swore that they saw the defendants shoot the *deceased.* These three swore, moreover, that they saw one another at the time of the shooting. Three other persons, namely, Lai Hay, Florence Wong and Grace Mack, swore, as stated, that they saw the defendants shoot into the doorway of the store, but they did not purport to state whether any one in the store was shot. Two others, namely, Frank Yee, sometimes called Frank Yee Gow, and Li Fong, swore, as stated, that they saw the defendants fleeing immediately after the shooting on Mott street towards the Mott street entrance to the arcade, *but they did not purport to state that they had seen the defendants shoot.* Two of the second group, namely, Florence Wong and Grace Mack, swore that they were *together* at the time when, as they say, they saw the shooting.

The defendants denied their guilt. They swore that they were strangers to one another. They offered testimony to establish that they were elsewhere than at the place of the shooting at the time when it occurred. Eng Hing said in substance in this regard that he had walked through the Arcade; had reached its Mott street entrance; was about to go into that street; that men at the entrance to the Arcade discharged revolvers and he spoke to them to cause them to desist, and failing turned and fled to avoid being shot. Lee Dock and two of the witnesses appearing for him swore that he was at 33 Allen Street at the time of the shooting in rooms occupied there by himself and a white man named McGann.

The case against the defendant Eng Hing was somewhat stronger than that against the defendant Lee Dock. This

was due in part to the fact that Eng Hing, wounded in the back, was arrested as stated very shortly after the shooting of the deceased in the building into which there is testimony that those doing the shooting fled and into which there is testimony that those pursuing fired, while Lee Dock was not arrested until several hours after the shooting and at a place further from the scene of the shooting and unwounded; and it was due in part to the fact that Eng Hing was alone in testifying as to his whereabouts at the time of the shooting, while as stated two witnesses besides Lee Dock supported the latter's alleged alibi.

This motion is based in part upon a written and oral recantation by Grace Mack of her testimony as given upon the first and second trial in that she now swears that she was elsewhere than where upon those trials she said she was and that she did not see the shooting. It is based in part upon an attack upon the testimony of Florence Wong involved in such recantation in that Florence Wong had sworn upon the trial that when she saw the shooting and identified the defendants she was alongside of Grace Mack. It is based in part upon a further attack upon the testimony of Florence Wong by affidavits and oral testimony going to the point that at the time of the shooting Florence Wong was not as she swore upon the trial a resident of No. 17 but of No. 32 Mott street. It is based in part upon alleged exculpatory evidence given by one Lew M. Solomon taken in connection with evidence given by Officer Maroney, in which Solomon swore in substance that on an unnamed date he went to visit a friend on Doyers street; that his friend was out; that he walked from his friend's residence to Pell street and down Pell street to Mott street, and then along Mott street on the Arcade entrance side towards such entrance, and that when within a few feet of it he heard pistol shots and saw a man standing in the doorway of No. 18 Mott street; that that man ran on Mott street towards the Arcade entrance and towards

Solomon and went up steps at the Arcade entrance in front of Solomon; that Solomon recognized such man by means of the gold filling in his teeth as a Chinaman named Yee Toy; that he could then have touched him with his hand; that such Chinaman ran through the arcade; that he followed at a distance of about five feet; that this distance was increased to ten feet when such Chinamen emerged from the Arcade's Doyers street exit; that such Chinaman entered a house nearer to Pell street on the more easterly side of Doyers street and disappeared; that he, Solomon, returned to the rooms of his friend on Doyers street, saw and spoke to his friend and was spoken to about the shooting and then went home.

The evidence given by Officer Maroney, who was not a witness upon the trial, was in substance that on the night of the shooting being on post on the westerly side of the Bowery about fifty feet north of Doyers street, he heard shots coming apparently from the direction of Doyers street; that he immediately ran in that direction; that he turned into Doyers street as several others coming from Chatham square entered it, such persons being slightly ahead of him; that he ran down Doyers street with such persons ahead of him, not at full speed, but looking to the right and left to see if he could discover who did the shooting; that the Doyers street entrance to the Arcade was at all times in his view, but that he did not particularly notice it; that he saw no one come from it; that when he reached a point on Doyers street about opposite such entrance he met a white man who was in the middle of the street facing the Bowery who said in substance that a man had run into a designated house on Doyers street somewhat nearer to Pell street; that he then ran to that house through its open door and hall, up several flights of stairs, seeing and hearing no one until he reached the top floor, where he saw standing near the foot of the stairs leading to the roof a woman named Sullivan to whom he spoke for a moment and who told him that a man had passed

through the scuttle; that he then ran up the stairs leading to the roof, found the scuttle open, which was unusual; saw no one, looked across the roofs, went to another scuttle about twenty-five feet away on another building, found that open and went down through that building out on to Pell street.

The defendants, in further support of their motion, claim to have shown by that part of the testimony of Grace Mack which relates to the alleged circumstances under which she claims to have sworn, as she did upon the trials, a conspiracy on the part of certain members of the On Leon Tong Society to falsely accuse these defendants of the shooting of Lee Kay, contending that the alleged false testimony given upon the trials by Florence Wong and Grace Mack was the outcome of such a conspiracy and that its existence discredits the testimony of such of the Chinese witnesses as were members of that society.

What new evidence, then, does this motion indicate that the defendants can produce should a new trial be accorded to them? The answer is that this motion indicates that upon a new trial if the People should call Florence Wong as a witness that the defendants could call Grace Mack to contradict Florence Wong as to the alleged seeing by Florence Wong at a time when she alleges she was in the company of Grace Mack of the shooting by the defendants into the doorway of No. 18 Mott street, and this motion further indicates that the defendants could also probably call the witnesses Greenberg, Rosenblum, Glass, Tim, Lee, Mrs. Todd and possibly others to contradict Florence Wong as to the place of her residence on the date of the shooting. Thus to this extent the suggested new evidence merely impeaches or contradicts the former evidence. The motion further indicates that the defendants could produce, irrespective of the calling of Florence Wong by the People, Lew M. Solomon and Officer Maroney and possibly Grace Mack in so far as her testimony relates to the persons who, as she alleged,

induced her to swear, as she says, falsely and the circumstances under which, as she says, she so swore.

What the defendants indicate that they could accomplish upon a new trial is rather that they could weaken the People's case by subtraction than that they could strengthen the defendants' case by addition.

The statute applicable to this motion provides that the court in which a trial has been had upon an issue of fact has power to grant a new trial when a verdict has been rendered against the defendant by which his substantial rights have been prejudiced, upon his application, in the following cases: *   *   *

7. When it is made to appear, by affidavit, that upon another trial the defendant can produce evidence such as if before received would probably have changed the verdict, if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence. The court in such cases can, however, compel the personal appearance of the affiants before it for the purposes of their personal examination and cross-examination, under oath, upon the contents of the affidavits which they subscribed (sec. 465, subd. 7, Code Crim. Proc.).

Section 466 provides that such an application in a case like the present, where the sentence is of death, may be made at any time before execution.

At common law, trial courts in criminal cases were without power to grant new trials. This was clearly pointed out in Quimbo Appo v. People (20 N. Y. 531). The power of trial judges to grant new trials was first given by Laws of 1859, chapter 339 (Lanergan v. People, 39 N. Y. 39). Since the enactment of the Code of Criminal Procedure it has been repeatedly held that the power to grant new trials is purely statutory, and that the court has no inherent power to do so (see People ex rel. Jerome v. General Sessions, 112 App. Div. 424, aff'd 185 N. Y. 504). In that case the Court of Appeals

said: "The jurisdiction and procedure of the Criminal Court are covered by the provisions of the Code of Criminal Procedure (People v. Hovey, 92 N. Y. 558; People v. Glen, 173 id. 395). The trial court possessed no inherent power to grant a new trial, and its authority in that respect was derived from sections 463, 465 and 466 of that Code." The requirements that the "newly discovered evidence" must fulfill have been distinctly stated by the Court of Appeals in People v. Priori (164 N. Y. 459, 472) as follows: "Newly discovered evidence, in order to be sufficient, must fulfill all the following requirements: 1, It must be such as will probably change the result of a new trial is granted; 2, it must have been discovered since the trial; 3, it must be such as could not have been discovered before the trial by the exercise of due diligence; 4, it must be material to the issue; 5, it must not be cumulative to the former issue, and, 6, it must not be merely impeaching or contradicting the former evidence" (p. 472). See to the same effect People v. Patrick (182 N. Y. 131, 179) and the decision of the Court of Appeals on the prior application for a new trial in this case (reported 212 N. Y. 373, at p. 386). The burden is upon the defendants to satisfy the court that the evidence is such that it would probably have changed the result if a new trial were granted (see People v. Gambacorta, 197 N. Y. 181, 189). The question, then, arising under the statute is: Is it probable that such testimony if before received would have changed the verdict?

The case against the defendants is weakened by the witness Grace Mack's recantation of her testimony, because whether her recantation be true or false she is shown by it to be one at times willing to swear falsely. It is weakened by the doubt which her recantation and the testimony adduced bearing upon the alleged residence of Florence Wong at the time of the shooting casts upon Florence Wong's truthfulness. It is further weakened if the witness Lew M. Solomon is credited, because if

he saw that which he says he saw, and saw it on the occasion of the shooting of Lee Kay on February 27, 1912, what he saw is inconsistent with and therefore casts doubt upon the testimony of other alleged eyewitnesses to the shooting; and it is further weakened if Grace Mack is to be believed by that portion of her testimony wherein she swears that her evidence upon the trial was suggested to her and procured to be given by her by persons named by her and connected with the On Leon Tong Society, because it suggests the possibility of motive on the part of those connected with that society to fasten the crime of the killing of Lee Kay upon these defendants as persons connected with a rival society known as the Hip Sing Tong, and therefore the presence of a motive for falsifying by certain alleged eyewitnesses to the occurrence who testified against the defendants upon the trial.

The defendants present no testimony in direct contradiction of the four Chinese witnesses who swore that they saw the defendants commit the crime or of the two who swore that they saw them in flight immediately upon its consummation. They present no testimony in direct reaffirmation of their respective alleged alibis. They present no evidence in direct exculpation unless it be said that the evidence of the witness Solomon was inconsistent with the defendants' guilt.

Beyond the assertion that they have established that two alleged eyewitnesses of the shooting and alleged identifiers of the defendants as the persons doing it, namely, Florence Wong and Grace Mack, testified falsely in that regard, and that an exculpatory inference is to be drawn from the testimony of the witness Solomon, and the suggestion that the alleged false testimony referred to was prompted by persons connected in official capacity with the On Leon Tong Society, and that from that circumstance an inference may be drawn that the testimony of the other alleged eyewitnesses connected with that society may likewise have been false and made under like induce-

ment the defendants suggest no reason for the granting of this motion.

Were it material to determine the question, it would be hard to decide whether Grace Mack did or did not see the shooting. Upon the trial both she and Florence Wong appeared to be telling the truth. The story which they then told and which Florence Wong adheres to is as intrinsically probable as that now told by Grace Mack. The remark said to have been made by Grace Mack upon the night of the shooting to Mrs. Todd indicating that she did not see it is as consistent with an effort on her part to avoid being called to testify to something which she saw in the light of a disinclination which she manifested to testify as to her absence in reality from the scene of the shooting at the time of its occurrence. If she was urged to give false testimony upon the trials it is plain that she has been urged persistently and strongly to testify in the way in which she has upon this motion. If On Leon Tong influence was exerted to further the conviction of the defendants, Hip Sing Tong efforts have been made to secure their acquittal and discharge.

Solely because the weight of evidence appears to be that Florence Wong did not live at No. 17 Mott street at the time of the shooting, but at No. 32 Mott street, the view is entertained that neither she nor Grace Mack saw the shooting. It was their alleged residence in one house at the time of the shooting and alleged conduct with each other in that house which to a large extent lent probability and naturalness to the story of their exit from it for the purpose of dining together at the restaurant at No. 16 Mott street on the night of the shooting. Thus the place of residence of Florence Wong was not a matter unrelated to the story told by herself and Grace Mack of the seeing of the shooting, and if untrue it discredits her story in an important particular and constitutes practically the only circumstance which now leads to the belief that she and Grace Mack did not see it. It is needless to say that it

does not in any sense follow from the circumstance that Grace Mack and Florence Wong did not see the shooting that they were induced to say that they did see it by any other witness who has testified that he saw it.

It is immaterial for the purposes of this motion to determine whether or not Grace Mack and Florence Wong saw the shooting because testimony that they did not see it would be merely testimony in impeachment and contradiction of former evidence, and it is to be remembered in this connection that the first motion made for a new trial in this case was not denied merely or chiefly because it then appeared improbable that the defendants upon a new trial could establish that Grace Mack and Florence Wong had sworn falsely, but on the contrary it was denied chiefly because were the defendants able to establish this fact testimony establishing it would have been merely by way of impeachment or contradiction.

The next attack upon the testimony of the witnesses referred to is made by means of inferences drawn from the affidavit and testimony of the witness Solomon. This attack is not of sufficient probative force to make it probable that had the testimony of Solomon been given upon the trial it would have changed the verdict. It appears from Solomon's testimony that since the alleged occurrence he has served a term in prison for larceny, and was in prison at the time of the trial of these defendants. That after the defendants' conviction and after Solomon's release he had a talk with a Mrs. Todd in her rooms on Pell street, in which he mentioned what he claims to have so seen, and on this motion he has purported to fix the date of the occurrence by a banquet which he attended in Boston, coupled with the period which elapsed after the dinner and before his return to New York, by the time which elapsed after his return to New York before his first visit to Chinatown, and by a payment received by him for certain written music from a concern which he names.

It further appears from his testimony that Yee Toy, the Chinaman named by him, is dead, and that he (Solomon) is now and for some time last past has been a salaried employee of the defendants' counsel. While Solomon is a young man of good family, of ability and education, and now leading, so far as disclosed, a reputable and creditable life, he had smoked opium and, as stated, he had been convicted of crime. Solomon had apparently become sympathetically interested in the fate of the defendants because of gratitude towards Mrs. Todd, a worthy woman, whom he properly regarded as his benefactress, who had interested herself to his knowledge in the defendants' fate, and had subsequently become interested in their fate as a salaried employee in the office of the defendants' present attorneys and as one specifically employed by them upon this motion as an investigator.

Solomon's testimony is made improbable among other things by the circumstance that he did not see Eng Hing in or at the Arcade, and that he did not see any one else run through the Arcade. Solomon purports to have first recalled the incident some two years after it happened. The incident as so recalled is but imperfectly identified with the shooting of Lee Kay. The collateral facts which Solomon mentions as fixing the date of the incident are either inadequately established or wholly unproved. The participant other than Solomon in it, namely, Yee Toy, is, as stated, dead. If the incident so recalled is identified with the shooting of Lee Kay, Solomon's testimony is inconsistent with the testimony of all the witnesses, whether for the prosecution or defense, who claimed to have seen anything connected with the shooting of Lee Kay. His testimony is not fortified by that of Officer Maroney. Officer Maroney's testimony may be consistent with that of Solomon, but not confirmatory of it.

Solomon's record and habits, the time and circumstances under which the incident is said to have been recalled by him, his

employment and connection with the case, the uncertainty that the incident as recalled by him relates to the shooting of Lee Kay, and the difficulty, if not the impossibility, of harmonizing his testimony with the undisputed facts and the concurring testimony of all who purport, whether for the defense or the prosecution, to testify upon the subject would in all probability combine to cause a jury to disregard Solomon's testimony in the rendition of a verdict.

The case against the defendants even as weakened is still strong. It remains supported by the concurring and except for the alibi evidence uncontradicted testimony of three unimpeached alleged eyewitnesses. No one disputes that these witnesses were where they could have seen what they said they saw. The uncontradicted evidence shows that at the time of the shooting they were each within a few feet of each other and of the deceased and of the persons shooting. They were in a lighted store. Those shooting stood in a lighted doorway. Another unimpeached witness says that from the doorway across the street he saw the defendants shoot into the doorway of the store and run. Two others swore that they came from an inside room immediately in the rear of that in which the deceased was shot, and that they saw and pursued and identified the defendants in their flight.

The concurrence of testimony referred to in support of the People's case reduces to a minimum the likelihood that the witnesses giving it were honestly mistaken. If untrue it is doubtless consciously false. It may have been perjured. If so these defendants will be the victims of perjured witnesses. Shall it be assumed that it was perjured because it was given by Chinamen? Mr. Wigmore well says that any attempt to attribute a rooted lack of veracity to any branch of the human family is based on a self-conceited assumption of a narrow experience (Wigmore on Evidence, sec. 936). Shall it be assumed that it was perjured because given in part by members of the On Leon

Tong Society when such testimony agrees with that given by Chinamen not shown to have been members of that society? A confederacy in perjury is improbable. Shall it be assumed to be perjured on an inference drawn as above from the testimony of Grace Mack, a woman until lately of bad repute and immoral life, who asserts that she has perjured herself and whose inconsistent statements establish that at least upon one occasion she has purposely sworn falsely, particularly when it is remembered that the defendants have seemingly found it impossible to corroborate her testimony as given upon this motion, while the People have procured from practically all the persons whom she accuses sworn denials? Finally, shall it be assumed to be perjured because of an opinion that some witness says she formed of the innocence of the defendants based on such opinion is shown to be upon insufficient data? The imputation of perjury is to be avoided.

It appears to be accepted on both sides that the homicide was a retaliatory act of persons connected with the Hip Sing Tong Society, a rival and antagonistic organization to the On Leon Tong Society, for the killing by members of the latter society on a prior date of the president and vice-president of the Hip Sing Tong Society, and that the person who was intended to be shot and killed on February 27, 1912, was not the one who was wounded and who died from such wound, namely, Lee Kay, but Lee Po Ming, who stood behind Lee Kay, and who, as stated, was the vice-president of the On Leon Tong Society. If this theory is correct it is not surprising that the persons who saw the occurrence were in part members of the On Leon Tong Society. It is, moreover, not surprising that other members of the On Leon Tong Society should take steps legitimate in character to discover and produce before the court witnesses to the shooting in aid of the prosecution of those who are said to have done it.

It appears that at the time of the shooting and for some

time prior thereto Mrs. Todd, who has appeared as a witness upon this hearing, was a resident of Pell street, in Chinatown, where she labored as a social worker and missionary. Her acquaintance was mainly with white girls who consorted with Chinamen and with Chinamen members of the Hip Sing Tong Society. She had met a few On Leon Tongs casually or on business. On the night of the shooting, but some time after it, she went to the place where it had occurred, and from there to No. 17 Mott street, where Grace Mack lived. On this occasion Grace Mack is said by Mrs. Todd to have told her that she, Grace Mack, had not seen the shooting, but had been at the Dewey Theatre when it occurred. Thereafter Mrs. Todd says she heard from persons whose names she cannot give that one Anna Moy, a white woman living with a Chinaman, had been with Lee Dock on the night of the shooting, whereupon she met and talked on several occasions with Anna Moy, who she says told her in substance that such was the fact, but that she either could or would not testify to it. This statement of Anna Moy, coupled with a talk Mrs. Todd had with Lee Dock in prison, led her to the belief that Lee Dock was innocent, and subsequently to the belief as the result of a talk with Eng Hing that he likewise was innocent, whereupon she urged on different occasions Grace Mack to state the truth, as she, Mrs. Todd, believed it to be respecting Grace Mack's whereabouts at the time of the shooting, and was instrumental in causing the interests of the defendants on this motion to be placed in the hands of the gentlemen now representing them. Anna Moy, the woman referred to by Mrs. Todd, denies upon this hearing that she was with Lee Dock at the time of the shooting, saying that she saw him last before his arrest on the afternoon of that day at half-past five, and that she does not recall the conversations as detailed by Mrs. Todd.

The strength of the original case, the small extent to which it is weakened, the unlikelihood that the new exculpatory evi-

dence would change the verdict as rendered, the impossibility in the light of the decisions of granting a motion on testimony which merely impeaches or contradicts former evidence and the unsubstantial character of the reasons advanced by Mrs. Todd, who has interested herself in the defendant's behalf for believing that they are innocent, lead to the denial of the motion.