**UNITED STATES v. HISS.**

United States District Court
S. D. New York.

July 22, 1952.

Comm. v. Inland Waterways Corp., 319 U.S. 671, 691, 63 S.Ct. 1296, 1307, 87 L. Ed. 1655.

Myles J. Lane, U. S. Atty. for the Southern District of New York, Stanley D. Robinson, Asst. U. S. Atty., New York City, for United States.

Beer, Richards, Lane & Haller, New York City, by Chester T. Lane, Robert M. Benjamin, New York City, for defendant.

GODDARD, District Judge.

Motion by defendant for a new trial on the ground of newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. was filed in the United States District Court for this District on January 24, 1952. The time for filing supplemental affidavits, and for the argument, was extended at request of both counsel to June 4, 1952.

The defendant, Alger Hiss, was indicted by the Grand Jury on December 15, 1948 on two counts of perjury allegedly committed in December, 1948 before the Grand Jury impanelled and sworn in the United States District Court for this District. The first count charged him with perjury when he testified under oath that he had never, nor had his wife in his presence, turned over any documents of the State Department or of any other Government organization, or copies of such documents, to Whittaker Chambers or to any other unauthorized person. The second count charged him with perjury when he testified that he thought he could definitely say that he did not see Chambers after January 1, 1937.

Hiss pleaded not guilty to each count of the indictment on December 16, 1948. He had two trials—the first, before a Judge of this court, lasted from May 31, 1949 to July 8, 1949 and resulted in a disagreement of the jury. The trial before me began on November 17, 1949 and lasted until January 21, 1950 and the jury found the defendant guilty on both counts. He was sentenced on January 25, 1950 to five years on each count of the indictment, the sentences to run concurrently. The conviction was affirmed by the Court of Appeals for this Circuit on December 7, 1950. 185 F.2d 822. A petition for rehearing was denied by the Court of Appeals on January 3, 1951, and the Supreme Court of the United States denied a petition for a writ of certiorari on March 12, 1951. 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683. The defendant surrendered to the United States Marshal on March 22, 1951 and was committed.

The Government argues that this motion was not made within two years as required by Rule 33 of the Federal Rules of Criminal Procedure. The notice of motion was served and filed on January 24, 1952 for hearing on February 4, 1952. Whether March 16, 1951—the date of the mandate of affirmance by the Court of Appeals—or January 25, 1950—the date when the judgment of conviction and sentence was entered, be regarded as the date of "final judgment", I think the motion should

be treated as being timely. See Marion v. United States, 9 Cir., 171 F.2d 185. Moreover, it is highly desirable that the merit or lack of merit of the matters presented by a motion of the character of the one at bar should be carefully and fully considered without being restricted by any technical defect in the timing of the motion.

Counsel for Hiss now asserts that the Woodstock typewriter No. 230,099 (Defendant's Exhibit UUU), offered in evidence by Hiss at the trial, is not the Hiss machine but is a forgery made to duplicate the work of the Hiss typewriter and used by Chambers to type the Baltimore Documents produced by him. In an effort to substantiate this charge defendant has submitted the affidavits of the following:

Martin Tytell, a typewriter engineer, in his affidavit states that in 1950 he was asked by the attorney for Hiss " * * * if it would be possible to construct a typewriter whose product would so nearly match the product of another typewriter in type defects, alignment and all other respects that a document expert comparing typed samples from the two machines would be led to believe that they had all been typed on the same machine. I told him that I thought this was entirely possible, particularly if I could have access to the machine which he wanted duplicated. He said he was more interested in finding out whether a duplicate machine could be constructed solely on the basis of samples taken from the machine to be duplicated. I said I believed this could be done, and undertook to try it. I have constructed a machine which I believe meets Mr. Lane's [defense counsel] specifications. Neither I nor any of my associates in the work have had any access whatsoever to the original machine during the course of the experiment. The duplicate machine has taken longer to construct than I originally expected. This is due in part to the fact that it was many months before a qualified impartial document examiner could be found who was able and willing to examine my results as I went along and check me on my progress". Evelyn S. Ehrlich, an alleged document expert, was consulted in December

1951 and the first samples were sent to her on December 14, 1951. Other samples were sent to her on December 31, 1951, and on January 7, 1952, as the construction of the typewriter progressed, which indicates that it had taken Tytell upwards of one year to construct his alleged duplicate machine. Mrs. Ehrlich, who describes herself as a detector of spurious prints, compared the work of Tytell with samples typed on No. 230,099. In her first affidavit she says—"When I examined them I was struck by the extraordinary degree of similarity which had been achieved in the typeface of these two machines. However, when I examined the samples more carefully under a microscope (magnification 30X) I found a few consistent details of difference which appeared to make it possible to separate these samples into two groups". Of the second set of samples given her on December 31, 1951, she says she reached the same conclusion. "Again I felt that I had successfully differentiated the typing of the two machines, but only on the basis of a few specific characteristics". After these experiments, "* * * Mr. Lane informed me which specimens were typed by one machine and which from the other (confirming the conclusions I had already reached), * * *". Concerning the testimony of Mr. Feehan, the Government expert from the laboratory of the Federal Bureau of Investigation [FBI], she says "Mr. Feehan took ten separate characters appearing both in the Baltimore Documents and in the Hiss standards and pointed out similar deviations [from the normal] in the two groups of documents. On this evidence he concluded that a single machine had been used. It is my opinion that Mr. Lane's two machines contain many more similar deviations [from the normal] than the ten which Mr. Feehan described to justify his testimony at the trial". She made a comparison of specimens of No. 230,099 with photocopies of some of the Baltimore Documents and photocopies of the Hiss standards. She had difficulty working from the copies and she will only say " * * * that it is entirely possible that the so-called Hiss machine now in Mr. Lane's possession is not the machine

which was used to type the Hiss standard". [Standard No. 46–B]

In her second affidavit, on comparing the original Baltimore Documents, the original Hiss standards (Nos. 34, 37, 39 and 46–B, and Defendant's Exhibit TT), and the work of No. 230,099, she again had difficulty working with the papers and she says only that "In my opinion, # N230099 cannot be the same machine that typed Government Exhibits 37 and 46–B and Defendant's Exhibit TT". She also states "On the other hand, I have not found it possible to form a definite opinion as to whether the Baltimore Documents were typed on # N230099".

Elizabeth McCarthy, an examiner of questioned documents, in her first affidavit on January 22, 1952 says—"The experiment has now been completed to the greatest extent possible in the time allowed. I am not prepared to say that the duplication between the two machines is even yet complete to the highest degree of accuracy, and in fact I know that there are still a small number of characters sufficiently dissimilar so that in the light of the careful observation I have had occasion to give to samples from the two machines during the progress of the experiment I should myself find it possible to distinguish between the products of the two machines". She states that an expert " * * * would find it difficult if not impossible to distinguish * * *" between them and says "In particular, the success of the experiment shows that any such testimony as that given by the Government's expert, Mr. Feehan, at the second trial, basing his conclusion of identity of machines on the identity of only ten characters in the two sets of documents, is absolutely worthless".

In her second affidavit, McCarthy, on comparing the original Baltimore Documents, Hiss standards and specimens of No. 230,099, says—"I have made my examination of the three sets of documents in the light of my knowledge of Dr. Norman's findings, * * *. Without considering the possibility of forgery, I should have concluded, by all standard tests ordinarily applied by questioned document examiners, that all three sets of documents were typed on the same machine. I should not have based this conclusion merely upon an inconsequential number of relatively identical peculiarities [referring to Feehan's testimony], but upon the more convincing fact that I find no substantial consistent deviations in type impressions as among the three sets of documents". She further says " * * * while I cannot say definitely that all three sets of documents were not typed on the same machine, I believe it just as possible, in the light of the observable facts, that the Baltimore Documents were typed on a machine which was not the original Hiss machine used for the standards, * * *".

It is evident that McCarthy, Ehrlich, and defense counsel have proceeded on an erroneous elementary assumption when they say that Mr. Feehan based his opinion, that the Baltimore Documents and the Hiss standards were typed on the same machine, solely upon a comparison of ten characters and his examination was therefore inadequate. For in Feehan's affidavit he states that "I examined and compared *each typewritten character* [emphasis added] appearing on the Baltimore Documents #5 through #9 and #11 through #47 with the known standards, taking into consideration style of type, alignment, horizontal and vertical spacing, footing, variations and defects". At the trial Feehan was asked, after he had stated his opinion, to " * * * point out to the jury *some* [emphasis added] of the evidence which you discovered which made you come to that conclusion". Feehan was not cross-examined regarding this testimony, and counsel for defense in his summation said:

"The Government expert said that in his opinion these Baltimore Documents were typed on the Woodstock typewriter. Undoubtedly that is a good opinion. As I told you in the opening, we consulted experts, and in their opinion they thought so too".

The typewriter No. 230,099, now challenged by the defense, was produced upon the trial by the defense and definitely identified by Hiss, Mrs. Hiss and several of the defendant's witnesses as the Hiss typewriter.

Daniel Norman, who describes himself as a consulting industrial chemist, in his first affidavit, states that he was consulted by defense counsel, who requested Norman to examine the machine No. 230,099. Norman says "My examination of Woodstock N230099 and comparison of it with the comparison machines [several old Woodstock typewriters furnished by defense counsel] point definitely to the conclusion that Woodstock N230099 is not a machine which has worn normally since leaving the factory, but shows positive signs of having been deliberately altered, in that many of its types are replacements of the originals and have been deliberately shaped". He says " * * * that the ends of the type on N230099 are covered with large irregular blobs of solder, which in general (29 out of 42 keys) have not been filed flat, while on the comparison machines the type-typebar joint is frequently evident and the solder has been filed flat". He states that he found a greater nickel content in heavy solder encrustations on type of No. 230,099 than in solder that "appeared normal", and "The appearance of the solder on N230099 definitely suggests that the soldering was not done at the Woodstock plant or by a professional repair man". He says he found that the typefaces on No. 230,099 differ in metal content and apparently "were not all made from the same batch of metal"; that he noted "abnormal tool marks" on letters A, Y, and T on No. 230,099. In his second affidavit he states he examined the Baltimore Documents and in his opinion the stains on some and absence of similar stains on others and the different conditions of the documents indicate that they were not stored together in the dumbwaiter shaft, or in the envelope produced by Chambers.

The affidavits, submitted by the Government, of Conrad Youngberg, assistant superintendent of the Woodstock plant for several years prior to 1930, thereafter superintendent; Otto Hokanson, superintendent of the plant until Youngberg took over; and Joseph Schmitt, the factory manager and employed by the plant from 1920 until date, state that after typefaces were attached to typebars the solder was filed and then they were nickel-plated; that repairmen who work on typeface usually don't re-nickel them; that the amount of solder on machines varied; that, in Schmitt's opinion, based upon Norman's photographs, the amount of solder on No. 230,099 is not abnormal and resembles Woodstock work; that the typefaces come from a stockpile which might be composed from different batches of steel; and that the markings on some of the typeface as shown in Norman's photographs are not the result of deliberate alterations but of rough wear and the typefaces striking the metal heels of other type in motion. These affidavits indicate that the presence of nickel arises from the plating process and that if there were changes in type, there would probably be less nickel present than on type which had not been altered.

James Cadigan of the FBI laboratory, in his affidavit submitted by the Government referring to the condition of the documents, states "The inference that papers of the same general class will show the same aging characteristics is without foundation. Far more important are variations in such constituents as rosin (sizing material), iron, lignin and bleaching. Rosin-sized paper is particularly susceptible to yellowing and aging and these changes are accelerated by heat and light. Consequently, whether or not they are of the same class, they cannot be expected to show the same aging characteristics if they are not identical in composition". The affidavit of William Magee, of the FBI laboratory, states that he compared paint splatterings from the dumbwaiter shaft with paint on the envelope and found it was of the same color, texture, and composition.

This purported new evidence of the defense regarding the condition and storage of the documents cannot be regarded as newly discovered evidence. Moreover, the documents were submitted to the jury which considered and passed upon this issue.

In McCarthy's second affidavit, she states that "No one person typed the Baltimore Documents. There were certainly two typists, whose work varied sharply in evenness of pressure, typing skill, mechanical un-

derstanding and control of the machine, style habits, and other similar respects". She says that Mrs. Hiss did not type any of the documents. "I base this conclusion to a considerable extent upon such factors, not clearly observable except from the original documents, as typing rhythm, pressure habits and variations, quality of touch, pace of typing, relative competence of the two hands, and the like. My conclusion from these factors is borne out by many other differentiating characteristics in such matters as style, mechanical skill, and habits of mind".

In Cadigan's affidavit, regarding the identity of the typist referred to by McCarthy, he states "It is true that certain aspects of touch and form could be of significance where an experienced typist was following habits and procedures of her own, but these certainly cannot be applied to an inexperienced typist who is copying documents * * *". At any rate, the identification of Mrs. Hiss as the typist is not an essential element of the case against Hiss.

The defense now attempts to establish that typewriter No. 230,099 was not manufactured until after a date in July, 1929 on which they say Fansler (Mrs. Hiss' father from whom the Hiss machine was received by them) already had the Hiss typewriter and submits the following memoranda, letters, and affidavits:

A memorandum based upon Woodstock records which defense says indicate that typewriter No. 204,500 was manufactured approximately on January 1, 1929, No. 220,000 about March, 1929, and No. 246,500 about January 1, 1930. Defense says the 1929 production figures indicate that 11,914 machines were manufactured during the first six months of the year. Although 13,452 serial numbers were skipped during the year and it is not known when nor what numbers were skipped, counsel reasons that even if they all were skipped early in the year, No. 230,099 would not have been manufactured before the first week of July.

Schmitt, the Woodstock factory manager, in a letter to counsel for defense, stated that "the machine in question was built approximately in July or August 1929".

However, when a representative of defense counsel prepared a draft affidavit for signature by Schmitt containing this statement above, Schmitt would not sign such an affidavit. J. T. Carlson, vice-president of the R. C. Allen Company, which later took over the Woodstock plant, in his affidavit for the defense, states that "Our records are not complete enough to give you exact dates of manufacture but from the records we do have, typewriter No. 222,402 was built in March or April, 1929 and serial No. 230,000 was built in April or May 1929". This would indicate that No. 230,099 was probably constructed shortly thereafter.

Kenneth Simon, a defense attorney, in his affidavit says he interviewed O. Carow, of Woodstock's Philadelphia office, to ascertain when Fansler's machine was sold to him but Carow could find no records on this matter.

Donald Doud, a document examiner, in a letter to defense counsel, states that he compared early Fansler letters with copies of the Baltimore Documents and Hiss standards and found that Fansler letters from July 8, 1929 on were written on an apparently new Woodstock different from one used on earlier letters, of which one was dated June 29, 1929. On examination of the three sets of documents he says "I can find no evidence to show that these early Northwestern Life specimens [Fansler letters] from July 8, 1929 to February 14, 1930 *could not* have been written on the same typewriter used for the Baltimore Letters and the Standard Hiss specimens". In a second letter, Doud states to defense counsel "In your letter of January 9, 1952 you ask me to submit an affidavit on two unrelated points with which you hope to establish the theory that typewriter 230,099 was a fraudulently made up machine in support of the Government's case against Alger Hiss. I have worked conscientiously and diligently on this matter but no evidence I have gathered to date has given me any reason to believe that theory, and I cannot subscribe to a statement tending to imply that evidence I have gathered supports that conclusion". He also says "My statement was to the effect that typewriter 230,099 * * * showed the same Type-

face Style and Pattern as the standard Hiss specimens and the Baltimore letters".

Defendant's supposition—and it is only conjecture with absolutely no evidence to support it—is that Chambers constructed the alleged duplicate typewriter from the typewritten characters in the Hiss letters, or that it was done for him by some Communist friends. The defense argues that it was made to use in his answer to the libel suit brought against him by Hiss and was constructed in the three months between the time of the Congressional hearing in August, 1948 and November 17, 1948, when the documents were produced by him. If this be so, it would mean that he constructed in three months a machine that has taken the defense's several experts at least one year to produce and that still falls short of being a perfect duplication. Moreover, there is not a trace of any evidence that Chambers had the mechanical skill, tools, equipment or material for such a difficult task. It is quite unlikely that Communist friends constructed it or provided the material, etc. for Chambers, as the defense suggests, because at that time his relationship with them was far from friendly. If Chambers had constructed a duplicate machine how would he have known where to plant it so that it would be found by Hiss? In planting a duplicate typewriter he would subject himself to the risk of the real Hiss machine being found and his entire case being destroyed.

The defense experts have been unable to show that Feehan of the FBI was wrong. McCarthy found no substantial deviations in type impressions between the Documents and the standards, whereas they were still able to distinguish between Tytell's work and that of No. 230,099. The Hisses and their witnesses identified No. 230,099 as their machine on the trial. Furthermore, this motion has not answered the handwritten documents produced by Chambers which were admittedly in Hiss' handwriting.

The defense reasoning that No. 230,099 was manufactured after the Hiss machine is not sustained by any proof. Their theory is based wholly upon incomplete records from which they have drawn speculations from approximate dates of manufacture. Some of their own witnesses cannot support their theory.

In the absence of *any* proof and in view of the many improbabilities in the theory of the defense, a jury could not reasonably find that Chambers constructed a duplicate typewriter or that No. 230,099 is not the Hiss machine.

Defense counsel states that Edith Murray, Chambers' maid, testified for the Government at the end of the trial, and defense had no way of preparing to test her truthfulness or the accuracy of her recollection by a complete cross-examination. She was cross-examined at length—29 pages of the printed record on appeal. Defense now attempts to show that Murray did not work for Chambers as she said. William Fowler, in an affidavit for the defense, states that Miss Hasson was the custodian of 903 St. Paul Street, Baltimore, where Chambers lived, and he (Fowler) visited her and her niece four or five times a week from 1932 until he married the niece in August, 1934, and thereafter he and his wife visited there for dinner three to five times a week. He says "My wife's aunt was very careful to know just what went on in the house at all times, and would discuss these things at meals, and that is one reason why I remember the house and the people who lived there as vividly as I do"; and "I am absolutely positive that no colored maid, or any maid, for that matter, was employed there during that period by any of the people * * *".

Fowler's wife in an affidavit for the Government says "From the date of our marriage [August, 1934] until approximately eight months later we visited my aunt at 903 St. Paul Street, Baltimore, Maryland, not more often than once every three weeks". Chambers testified that he arrived at 903 St. Paul Street in the late summer or fall of 1934.

Louis Leisman, custodian of 1619 Eutaw Place, Baltimore, next to 1617 Eutaw Place where Chambers lived, in an affidavit for the defense says—"I know from my own observation that Chambers, or Cantwell, never employed a colored maid", stating that "In the winter time I was regularly

in the basement in the morning and in the evening where I lived, in which there was a basement window that reached a little above the street level from which I could see the steps of 1617 and 1619 Eutaw Place. I stood there each day to watch for tenants in my house in order to catch them to collect rents due or to tell them to get out if they had proved undesirable. In warm weather I would either sit on the front steps outside my house or on a chair set against the railing, * * · * ".

The Government says that Leisman has in the past used aliases, has been twice convicted, is a heavy drinker, and in general is irresponsible.

This evidence is neither convincing nor conclusive for the opportunities of Fowler and Leisman to observe Murray were limited. Both 903 St. Paul Street and 1617 Eutaw Place were houses converted into apartments and there appears to be no reason why Fowler and Leisman should have noticed Murray particularly nor why they should, sixteen years later, recall not seeing her. At any rate, this could not be the basis for a new trial, for there is no indication that the defendant or his lawyers made any effort to elicit this information and offer it at the trial—no request for an adjournment or continuance was requested at the time—and the facts do not justify the inference that this information was sought with due diligence.

Defense counsel points out that Chambers in his early story placed his defection from the Communist Party as at the end of 1937; and that he testified at the trial that it occurred approximately in the middle of April, 1938, and then said that he thereafter moved and remained at Old Court Road, Baltimore, for about a month until he had obtained a translation from Paul Willert of the Oxford University Press. The defense seeks to show here that Chambers left the Party before April and thus would no longer have received documents, one of which is dated April 1, 1938, from Hiss.

Martin Gumpert in an affidavit for the defense, says that Rita Reil was hired for the translation of his book in December,

1937; that her translation of the first few chapters was inadequate and she began anew. He says "I do remember that the new translator was engaged within two or three weeks, at the most, after Mrs. Reil's second translation was declared inadequate. As soon as the new translator, Mr. Chambers, was engaged I asked to meet him * * *. I was told by Mr. Willert that I would be unable to meet my new translator because he was in hiding from the Russian secret service * * * ".

Copies of letters obtained by the defense from the files of the Oxford University Press, regarding the translation, do not fix the exact dates either but do indicate that at least a part of the manuscript was sent to Chambers on March 18, 1938.

Paul Willert, in an affidavit for the defense, says, "I first met the gentleman known to me as David Chambers when he came to me as a possible translator of Martin Gumpert's book: 'Dunant: the Red Cross'. He was strongly anti-communist and, in fact, described himself as a victim of communist persecution. According to the best of my recollection and belief that first meeting occurred at the end of 1937 or at the very beginning of 1938". He states "I can say that Chambers must have been given the translation a considerable time before the 18th March 1938".

This evidence does not establish that Chambers was no longer in the Party in April, 1938. The testimony Chambers gave as to the date he took the translation was an approximation of an event that had occurred some eleven years previously. It is apparent from his testimony that this was a statement in reference to a collateral incident and that he had fixed the date of his break with the Party independently of the time of translation. Consequently, though he may have erred by a few weeks in his recollection as to the time he took the translation, it does not establish that he erred as to the date of break with the Party, nor, more important, that he could not have received the Documents from Hiss. Furthermore, the defense has not shown that this evidence could not have been offered at the trial if it thought it worthwhile and used due diligence, for the

time when Chambers left the Party was an element in the issues submitted to the jury at the trials. In a consideration of the standard of due diligence required, it must be noted that the defendant was ably represented by competent counsel in two trials and over a year elapsed from the time of indictment to the date of sentencing. Ample time was afforded to marshal the relevant testimony and evidence.

The defense challenges Chambers' testimony, given before the House Committee, that Hiss and Pressman belonged to the same Communist group. This testimony was read into the record at the trial. Defense states that Lee Pressman, on August 28, 1950, testified before the House Committee on Un-American Activities that "I do know, and I can state as a matter of knowledge, that for the period of my participation in that group, which is the only basis on which I can say I have knowledge, Alger Hiss was not a member of that group". Pressman said that he had belonged to a Communist group in Washington from 1934 until the latter part of 1935.

This testimony of Pressman is solely an attempt to impeach Chambers and as such is not ground for a new trial. Hiss was tried for perjury. There was substantial evidence to indicate that Hiss passed documents to Chambers and had seen Chambers though he denied having done so. Pressman's testimony does not refute this. Furthermore, Nathaniel Weyl, before the Internal Security Subcommittee of the United States Senate, in February, 1952, identified Hiss and Pressman as members of a Communist cell.

The defense has raised certain additional points which have been considered by me but have not been discussed in this opinion since they are not probative of anything material to the issues of the case.

 The federal courts have quite generally applied the rule announced in Berry v. State of Georgia, 10 Ga. 511, requiring a party seeking a new trial on the ground of newly discovered evidence to show the following vital elements:

"(a) The evidence must be in fact, newly discovered, i.e., discovered since

the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." Johnson v. United States, 8 Cir., 32 F.2d 127, 130.

See also Evans v. United States, 10 Cir., 122 F.2d 461; Thompson v. United States, 88 U.S.App.D.C. 235, 188 F.2d 652; Wagner v. United States, 9 Cir., 118 F.2d 801; Prisament v. United States, 5 Cir., 96 F.2d 865; Brandon v. United States, 9 Cir., 190 F.2d 175; Heald v. United States, 10 Cir., 175 F.2d 878. See also United States v. Johnson, 327 U.S. 106, at page 110, 66 S.Ct. 464, 90 L.Ed. 562.

A separate rule is that applied in Larison v. United States, 7 Cir., 24 F.2d 82, 87, which allows a new trial where:

"(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

"(b) That without it the jury might have reached a different conclusion.

"(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial."

In United States v. Johnson, 7 Cir., 142 F.2d 588, at page 591, the court explained the distinction between and the applicability of the two rules, pointing out that the Larison rule is applicable where there has been a recantation or where it has been proved that false testimony was given at the trial. See Gordon v. United States, 6 Cir., 178 F.2d 896. Otherwise, the Berry rule is applied. Accord, United States v. Johnson, 7 Cir., 149 F.2d 31, at page 43, reversed on other grounds in 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562.

There is general concurrence of authority that the granting of new trials on the ground of after-discovered evidence is not favored by the courts and they are granted

with great caution. Weiss v. United States, 5 Cir., 122 F.2d 675, page 691; Long v. United States, 10 Cir., 139 F.2d 652, at page 654.

The contention of the defendant is that under either rule he is entitled to another trial. On the contrary, I am of the opinion, after a full consideration of all the defendant has offered, that under either rule he is not entitled to a new trial. The defendant has submitted no proof, which would support a finding by a jury that the typewriter received in evidence at the trial was constructed by or for Chambers or that the typewriter was not the original Hiss machine. There is no newly discovered evidence which would justify the conclusion that if it were presented to a jury, it would probably result in a verdict of acquittal.

The motion is denied.