**UNITED STATES v. RUTKIN.**
**No. 10795.**

United States Court of Appeals
Third Circuit.

Argued June 1, 1953.

Decided Dec. 10, 1953.

Rehearing Denied Jan. 12, 1954.

See also 200 F.2d 607.

**648**

Lemuel B. Schofield, Philadelphia, Pa. (Joseph Sharfsin, Philadelphia, Pa., and Edward Halle, New York City, on the brief), for appellant.

Stuart B. Rounds, Asst. U. S. Atty., Trenton, N. J. (Grover C. Richman, Jr., U. S. Atty., Newark, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and KALODNER, Circuit Judges.

BIGGS, Chief Judge.

The appellant, Rutkin, was convicted on a charge of willfully attempting to evade or defeat a part of his income tax due for the year 1943. See 26 U.S.C.A. § 145(b). This court affirmed his conviction, one judge dissenting. See 1951, 189 F.2d 431. Certiorari was granted, and the Supreme Court upheld the judgment of this court. See, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833. Rutkin then applied to the trial judge for a new trial on the grounds of newly discovered evidence, Rule 33, Fed.Rules Crim.Proc., 18 U.S.C.A., and of alleged fraud perpetrated on the court below by Reinfeld, the principal witness for the prosecution. Following a hearing, this motion was denied without opinion. Rutkin appeals.

Rutkin's conviction for income tax evasion was based upon his failure to report as taxable income $250,000 in cash received from Reinfeld on May 11, 1943. Rutkin contended that this amount, the receipt of which he acknowledged, represented his distributed share of a capital gain resulting from the sale of the stock of Browne Vintners Corporation. He asserts that he and Reinfeld were two of the beneficial owners of the stock of this corporation. The United States conceded that if this were so, the capital gains tax had been paid prior to the distribution to Rutkin and that therefore there could be no tax liability on Rutkin's part. It was the contention of the United States, however, that Rutkin possessed no interest in the stock of the corporation, the sale of which produced the $250,000 gain, and that Rutkin had in fact extorted this amount from Reinfeld by threatening to kill him and his family.

The evidence given at Rutkin's trial was sharply contradictory—contradictory indeed to the point where the trial judge stated that it was obvious that perjury had been committed. Reinfeld testified for the United States that al-

though he and Rutkin had been partners, prior to the repeal of prohibition, in a bootlegging combine, Rutkin received no interest in the legitimate liquor business represented by the Browne Vintners Corporation, which replaced the combine following the repeal of the Eighteenth Amendment. Reinfeld stated that at no time after the organization of Browne Vintners was Rutkin his partner in any business enterprise or venture; he denied that Rutkin was entitled to a share of the proceeds of the Browne Vintners stock. Reinfeld and his brother-in-law, Holtz, testified to various threats made by Rutkin on Reinfeld's life which, they said, culminated in the payment of the $250,000 by Reinfeld to Rutkin. Rutkin denied making these threats and repeatedly asserted that he had a substantial interest in Browne Vintners, an interest which he said Reinfeld had undertaken to hold for him as a kind of trustee. Rutkin's conviction demonstrates that the jury accepted Reinfeld's testimony. The question now before us is whether the showing made by Rutkin on his motion for a new trial is sufficient to require that the jury verdict be set aside and Rutkin tried again.

The United States and Rutkin have agreed that to warrant the granting of a new trial on the ground of newly discovered evidence, "There must ordinarily be present and concur five verities, to wit: (a) The evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered

evidence would probably produce an acquittal." Johnson v. United States, 8 Cir., 1929, 32 F.2d 127, 130. This is an accurate statement of the applicable law. See also Evans v. United States, 10 Cir., 1941, 122 F.2d 461, 469; United States v. Hiss, D.C.S.D.N.Y.1952, 107 F.Supp. 128, 136. Rutkin contends that the evidence he presented to the trial judge satisfies all of the requirements.

Rutkin first offered an affidavit of Joseph A. Frayne, executed April 12, 1952, purporting to set forth two conversations between Frayne and Reinfeld. Frayne, according to his affidavit, was at some time Chief of the Fugitive Squad of the Bureau of Internal Revenue of the United States. The affidavit does not set forth the nature of Frayne's employment at the time of his alleged conversations with Reinfeld. It appears that at the time the affidavit was executed Frayne was no longer employed by the United States. Both of the conversations which we have referred to date from a period after the organization of Browne Vintners but prior to the sale of the stock of that company. In each conversation Reinfeld is quoted as stating that Rutkin was his partner. These admissions, if true, would tend to contradict Reinfeld's testimony at Rutkin's trial and to destroy Reinfeld's credibility. Counsel for the appellant in their brief and during the course of the oral argument on the motion for a new trial took the position categorically that the evidence offered by Frayne in the affidavit was not merely cumulative or impeaching, that it brought to the case for the first time evidence that Reinfeld had admitted that Rutkin was actually a partner of Reinfeld and his associates in the Browne Vintners enterprise.[1] This position is not borne out by the record of the trial as will appear hereinafter.

---

[1]. The actual statements made in Rutkin's brief are as follows:

"If, however, testimony were available to petitioner that Reinfeld had admitted petitioner's status as a partner, such testimony would obviously have been most material." and: "There was no evidence on the trial of any conversations between Reinfeld and anyone else in which the former admitted petitioner's status as a participant in the Browne Vintners venture. This is wholly new evidence of a category entirely different from any presented at the trial. If believed, it stamps the testimony of Reinfeld as that of a perjurer."

During the trial evidence was given as to other alleged admissions made by Reinfeld as to his partnership with Rutkin in Browne Vintners. These admissions tended to contradict Reinfeld's testimony at Rutkin's trial that he, Reinfeld, was not Rutkin's partner in that enterprise. This testimony impeached Reinfeld's credibility.

■ Frayne's affidavit states that the first conversation took place in New York City about the latter part of 1939. At that time Reinfeld is said to have remarked to Frayne in reference to Rutkin's refusal to implicate Reinfeld in the operation of an illegal distillery, an operation for which Rutkin had been jailed, "Well, you can always depend on your partners and your pals." The affidavit further states that Rutkin himself was present when Reinfeld made this remark. We think that Rutkin's presence at the conversation destroys his claim that this is "newly discovered" evidence. Rutkin should have recalled the conversation prior to his trial. Rutkin's failure to remember this episode does not entitle him to retry his case. If lapse of memory alone were sufficient to warrant a new trial, there would be no end to litigation. We note that Rutkin does not rely heavily on this conversation in this appeal.

The second conversation is stated to have taken place about the end of 1940 or the early part of 1941. News of the proposed sale of Browne Vintners Corporation had appeared in the newspapers. Frayne swears that he met Reinfeld and his bodyguard, Zimmy, on a Hudson Tube train and remarked to Reinfeld, "I see by the papers that you are getting rid of the Browne Vintners." Reinfeld is said to have answered, "Yes, my partners will come in for a lot of dough just as soon as the deal is closed. I would like to see my partner, Jimmy Rutkin, get a break and not piss away the money or gamble it away as he usually does when he gets his share." Frayne's affidavit states that Reinfeld asked him, Frayne, if he could arrange to have Rutkin make some sound investments which would protect Rutkin from his spending habits and assure him a regular income. Rutkin was not present at this conversation.

Zimmy, in a separate affidavit, has verified the occasion of the meeting stating that a conversation did take place on a Hudson Tube train between Frayne and Reinfeld at about the time indicated. Zimmy did not overhear the content of the conversation. Zimmy also states in his affidavit that during his association with Reinfeld he had heard Reinfeld refer to Rutkin as his partner on numerous occasions.

In an answering affidavit Reinfeld has denied that he ever told Frayne that Rutkin was a "partner" in Browne Vintners or that Rutkin would receive a share of the proceeds of the sale of that business. Reinfeld has sworn that he never asked Frayne to arrange to have Rutkin make any investments for any purpose whatsoever. Reinfeld did not recall ever meeting or knowing Frayne, although he admitted having heard of him. Reinfeld's affidavit was directed to the statements made by Frayne; it did not refer to the affidavit of Zimmy.

The second conversation alleged to have occurred between Reinfeld and Frayne provides the substantial basis for Rutkin's present motion. We will consider this conversation in the light of the applicable legal principles. We have noted the circumstances under which Frayne came to give his affidavit after Rutkin's conviction and the intrinsic credibility of his averments. We observe that at the hearing on Rutkin's motion for a new trial the court below refused to allow Frayne to give oral testimony or to be examined upon his affidavit. We are aware that the court below heard statements by the Assistant United States Attorney, unsupported by any proof, which tended to challenge Frayne's veracity. But we conclude, as will appear, that the procedure at the hearing below, however summary, did not prejudice Rutkin for, accepting Frayne's affidavit and that of Zimmy at their face value, we conclude that the affidavits

do not afford a sufficient basis for a new trial.

Rutkin himself testified at length at his trial as to statements by Reinfeld assuring him that he, Rutkin, was entitled to an interest in Browne Vintners, which interest was being held for him by Reinfeld. But Rutkin's testimony was not the only evidence relied on to establish his status as a "partner" in Browne Vintners. Thus, Bennet, an officer of Browne Vintners from February 1937 to March 1941, testified that Reinfeld introduced Rutkin to him in the fall of 1937 under the following circumstances: "We were riding along and I recall that we were talking in the car about business, and Mr. Reinfeld—I sort of maybe was not so open as I should be and Mr. Reinfeld said that I need have no secrets from Mr. Rutkin, I could speak freely, that Mr. Rutkin was his partner. I recall that." Question: "That Mr. Rutkin was a partner?" Answer: "Yes."

Joseph Davis, a shareholder in Browne Vintners from its inception and an officer of the Corporation from 1937 until its sale in 1940, testified that Rutkin asked him to attend a meeting at the Park Central Hotel in mid-1940. Present at that meeting, besides Rutkin, were Zwillman, Stacher, Reinfeld, Joseph Davis and Harry Davis, all of them acknowledged shareholders in Browne Vintners. Joseph Davis, who was Harry Davis' brother, stated that Reinfeld laid before the meeting his proposal for the sale of Browne Vintners stock, and "asked if I [Davis] would be in favor of selling the company." Question: "Asked you if you were in favor?" Answer: "That's right." Question: "And then what did he [Reinfeld] say?" Answer: (Continuing.) "Then I said I would. He then asked my brother and then he asked Zwillman and Stacher and Rutkin." Question: "He asked each one individually?" Answer: "That's right." Question: "And each one indicated their willingness to sell, didn't they?" Answer: "That's right." Question: "And then it was after that that the company was actually sold?" Answer: "That's right." Harry Davis corroborated this testimony.

Samuel I. Kessler, a lawyer who participated in the conferences held in 1942, to resolve disputes as to the distribution of the proceeds of the sale of Browne Vintners, gave the following testimony: "When I got there, Mr. Reinfeld spoke up and told me that there was a controversy with relation to certain monies to be paid off in the liquidation of Browne Vintners and that Mr. Stacher and Mr. Zwillman were dissatisfied with the amount of money they had received * * *. And then I asked him to identify who all these people were and he mentioned his [Reinfeld's] brother who was there present with him and Holtz, —he [Reinfeld] said, 'You know Holtz.' I said I did. Then when he came to Rutkin, he said, 'Rutkin is here. He has the same claim as the claims that Stacher and Zwillman have and he says he didn't get all his money * * *.'"

But there was more than this to Kessler's testimony in support of Rutkin's position. Kessler further described a later meeting of the participants in the Browne Vintners syndicate. He testified that Reinfeld agreed to pay Rutkin $250,000 in settlement of the latter's alleged interest in the enterprise.[2] It

2. Kessler testified as follows in reply to a question asked by Rutkin's counsel at the trial as to what transpired:

"A. * * * [A]t that time Mr. Rutkin said 'Now, what about my claim?' and I said, before anybody else had a chance to say anything else, I said, 'Joe, you have been friendly with this man for so many years, you have heard all of this discussion of these claims that were made on behalf of Stacher and Zwillman; you know the concessions you made in my office;' I said, 'Go into my library with Rutkin. You probably can settle this, without the help of us lawyers or anybody else.' And they went into my library. My private office is an office on one side and right next to it with a connecting door is my library; and they went into the library and they were in there for ten or fifteen minutes.

may be asserted that Reinfeld's willingness to pay $250,000 to Rutkin was only a compromise of a disputed claim and that Reinfeld was willing to make the settlement to avoid danger to himself or to his family because of Rutkin's threats. But we are of the opinion there was sufficient basis for the jury at Rutkin's trial, if it had believed Kessler's testimony, to have found that Reinfeld had acknowledged Rutkin to be entitled to share in the proceeds of the Browne Vintners sale, and hence Rutkin was, at least to some degree, a joint-adventurer therein.

There is even further evidence in Kessler's testimony in support of Rutkin's position. Kessler testified that following Reinfeld's agreement to pay Rutkin $250,000 in settlement of his share in the Browne Vintners enterprise that Zwillman asked whether taxes had to be paid on the sums promised to Zwillman, Stacher and Rutkin and that Reinfeld stated that the sums to be paid in settlement were "tax free".[3] This amounts to an admission by Reinfeld that Rutkin's claim against the Browne Vintners fund was on the same footing as the claims against Stacher and Zwillman, the latter being unquestionably entitled as participants.

It should be pointed out as emphasis is laid on the "character and standing"— to employ the words of Rutkin's brief —of Frayne as a witness, that Kessler was a member of the bar in good standing. The record shows that Reinfeld had requested him to act somewhat as an umpire to resolve disputes as to the distribution of the proceeds of the sale of Browne Vintners but that Kessler had refused to serve in this capacity stating that he would be present as an attorney representing Zwillman and Stacher. Nonetheless it is apparent that all of the persons present accepted Kessler's suggestions as to questions not affecting his own clients and that it was through Kessler that a purported settlement of the controversy between Rutkin and Reinfeld was effected. We can perceive no reason why Kessler's testimony should not stand on substantially the same footing as that offered by Frayne insofar as Reinfeld and Rutkin are concerned for Kessler appears to have been a disinterested witness in his relations to them. Moreover, Kessler's clients' settlements had been agreed to prior to the taking up of Rutkin's claim. While Kessler on occasion represented members of the syndicate and his brother and law partner was a member of the board of Browne Vintners, there is nothing in the record to indicate that Kessler's representation was other than legitimate and ethical.

These excerpts from the evidence at Rutkin's trial are the equivalent of admissions by Reinfeld of Rutkin's interest in Browne Vintners and of Rutkin's right to receive part of the proceeds of the sale. But there is also additional support for such a conclusion in the testimony tending to establish Rutkin's interest in Browne Vintners in ways other than through the alleged statements and conduct of Reinfeld. Thus the witness Gaines testified at Rutkin's trial that Rutkin introduced Reinfeld to him as his partner about 1936 in connection with the promotion of a Browne Vintners scotch whiskey. Kanengiser testified

3. Kessler was asked:

"Q. Then did they come out? A. Then they came out.

"Q. And when they came out, what did they say? A. They came out and Mr. Reinfeld said, and Mr. Rutkin confirmed it, that 'We have settled our differences for $250,000 and we are shaking hands on it,' and they actually went through the performance of shaking hands.

"Q. They shook hands right there? A. Yes, sir."

"Q. * * * Was anything said about taxes on this money?"
He answered:
"After that Mr. Zwillman said, 'What about these monies? Are they tax free?' Mr. Reinfeld says, 'Yes, they are tax free.' Mr. Cohen stepped in and says, 'Yes, all the taxes have been paid. We always talked about it here. I will show you the sheet.' and he pulled out a sheet which indicated, as I read it, that taxes were paid upon all of the capital gains of Browne Vintners Company."

that of the money taken from the bootlegging combine to finance Browne Vintners a share was credited to Rutkin. Facher swore that Rutkin continued as a partner in business with the others after the bootlegging combine was dissolved. There was also substantial evidence of Rutkin's interest in Browne Vintners in the testimony of Pokrass, Haupt, Joseph Davis and Mrs. Thum, receptionist at the Browne Vintners' offices in New York City, who testified as to the freedom and frequency with which Rutkin used the offices. The defense which Rutkin presented to his indictment was a strong one.

The remaining evidence offered by Rutkin as newly discovered consists of a formal letter, addressed "To whom it may concern," written by Holtz in 1941 on Reinfeld's stationery, recommending Rutkin as a reliable person to be the recipient of a liquor license. The letter states that Holtz had known Rutkin for twenty years, whereas on Rutkin's trial Holtz testified that he had known Rutkin only slightly and had had no conversations with him prior to 1939. Although the letter was in the possession of Rutkin's wife, Rutkin seemingly had no recollection of the letter because Holtz's testimony in this regard took him by surprise. This appears from an affidavit filed by Rutkin in support of his present motion for a new trial. It appears that Rutkin's wife rediscovered the Holtz letter in March of 1952. We conclude that this letter has but little evidentiary value, even to impeach Holtz, a distinctly collateral issue. Holtz admitted on cross-examination that he had known Rutkin quite a while and became much better acquainted with him in 1939. The degree and duration of Holtz's familiarity with Rutkin could not very materially affect the credibility of Holtz's testimony as to Rutkin's threats on Reinfeld's life in 1942. Such an issue is collateral at best.

Coming now specifically to the evidence offered by Frayne's affidavit and viewing its contents in the light of the other affidavits offered by Rutkin and the record of his trial, we state that there are some decisions of State courts holding that the evidence of a *disinterested* witness to a point vital in establishing the defendant's guilt may lose its mere *cumulative* or *impeaching* character, and, if of such a kind as would probably produce an acquittal, will warrant the granting of a new trial. Though Rutkin does not specifically assert that Frayne was a *disinterested witness* and it is clear that the United States would not concede him to be such, we deem it desirable nonetheless to discuss some of the State court decisions [4] relating to this subject.

4. The newly discovered evidence of a disinterested witness to the actual crime has served as the basis for a new trial in the State courts on occasions of comparative rarity. Sometimes this has been with the aid of a statute or conversely in the teeth of a statute. An example of the first type of decision is State v. Evans, 1920, 98 Or. 214, 192 P. 1062, 193 P. 927, where a statute, L.O.L. § 174, authorized the granting of a new trial for "newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial." It should be observed that the test of the newly discovered evidence being non-cumulative or non-impeaching is not supplied by the Oregon statute. But in People v. O'Brien, 1905, 110 App.Div. 26, 96 N.Y.S. 1045, the statute, Section 465, N.Y.Crim.Code, specifically provided that the newly discovered evidence should not be merely cumulative or impeaching, but the court granted a new trial because of the newly discovered evidence of an eye witness to the crime, who was not a co-defendant, such evidence being cumulative and impeaching. Later New York decisions do not appear to follow the O'Brien decision. See People v. Burke, 141 Misc. 778, 253 N.Y.S. 817, affirmed 1932, 236 App.Div. 723, 257 N.Y.S. 1042, and People v. Eng Hing and Lee Dock, 1914, 212 N.Y. 373, 106 N.E. 96, a decision of the Court of Appeals of New York.

We believe that the State law is correctly set out in Section 842 of "Underhill's Criminal Evidence", 4th ed. Niblack (1935), which states, "A motion for a new trial on the ground of newly-discovered evidence must be denied, if it appears to the court that the evidence would have been cumulative merely if it had been introduced at the trial." See the numerous State court decisions cited to the

■■ As we have indicated in footnote 4 we have found no State court decision in which a new trial was granted under circumstances substantially similar to those at bar; nor have we found a decision of a federal court to such effect. The decision of the Supreme Court of Georgia in Berry v. State of Georgia, 1851, 10 Ga. 511, cited in footnote 4 to the text in United States v. Johnson, 1946, 327 U.S. 106, 110, 66 S.Ct. 464, 90 L.Ed. 562, seems to have set the rule not only for the State courts but also for the federal courts. See United States v. Johnson, 7 Cir., 1944, 142 F.2d 588, 592, and United States v. Hiss, supra, 107 F.Supp. 128, at page 136. Rule 33, F.R.Crim.P. provides that: "The court may grant a new trial to a defendant if required in the interest of justice. * * *" We think it is clear that in determining the kind and quality of newly discovered evidence which will warrant a new trial the federal courts are not bound by the decisions of the courts of the State in which the trial took place.[5] We conclude, however, there is no real dichotomy between State law and federal law on this subject. The law of New Jersey for example seems to follow Berry v. Georgia, supra, and Johnson v. United States, supra, 32 F.2d at page 130, and that law also would compel the conclusion which we have reached. See State v. Bunk, 1950, 4 N.J. 482, 73 A.2d 245. It is the weight of authority in both State and federal courts that newly discovered evidence offered as a basis for a new trial must not be merely cumulative and impeaching. In any event it must be of such a character as would probably produce an acquittal at a new trial. See Johnson v. United States, supra, 32 F.2d at page 130. Obviously if it be merely cumulative and impeaching and of such a character as would not probably result in an acquittal at the new trial, the interest of justice would not be served in granting a new trial. See Rule 33, F.R.Crim.P. The evidence offered by the Frayne and Zimmy affidavits leads straight back to the dispute as to veracity at the trial. The jury elected not to believe Rutkin and those testifying on his behalf. Veracity of witnesses may not be tested for a second time and by an appellate tribunal.

■■ We are of the opinion that the new evidence offered was merely cumulative and impeaching and was not of such a character as would probably lead to acquittal at a new trial. The district Judge was of like opinion. Certainly we cannot say that he abused his discretion in refusing the motion for a new trial. Cf. Prisament v. United States, 5 Cir., 1938, 96 F.2d 865, 866 and Wagner v. United States, 9 Cir., 1941, 118 F.2d 801, 802. It is the law that the trial court must be allowed wide discretion in granting or refusing a new trial on the ground of newly discovered evidence. Casey v. United States, 9 Cir., 1927, 20 F.2d 752, certiorari denied 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed 632.

---

text. We have found no State court decision in which a new trial was granted under circumstances substantially similar to those at bar.

5. Rule 26, F.R.Crim.P. provides: "*Evidence.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules. The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

This rule supplies, we think, a somewhat useful analogy. It provides that the admission of evidence, offered at a trial in a United States court, shall be governed by the principles of the common law as interpreted by courts of the United States. In the last analysis the kind and quality of the newly discovered evidence supply the real criteria as to whether a new trial should be granted. It will be noted that Rule 26 differs from the corresponding rule for civil cases, Rule 43(a), Fed.Rules Civ.Proc. 28 U.S.C.A., which in effect prescribes conformity to State law. See notes 1 and 2 to Rule 26 of the Advisory Committee which drafted the Criminal Rules.

Rutkin also presses his contention that Reinfeld committed fraud upon the court below by perjuring himself on the issue as to whether or not Rutkin had been a partner in Browne Vintners. We think that the evidence which Rutkin offers to obtain a new trial on the ground of newly discovered evidence, if insufficient for that purpose as we have found, cannot be accepted as sufficient to establish fraud. As the trial judge remarked, there was perjury committed by at least one witness at Rutkin's trial and issues of fact, under our system, are to be resolved by the triers of fact. The jury seemingly determined that Reinfeld was not the perjurer despite considerable evidence challenging his veracity. We will not take a contrary view based on evidence which we have held cumulative to that adduced at the trial.

Rutkin, however, complains that the court below at the hearing on his motion unduly restricted his offer to prove fraud by oral testimony. He contends for example that the court below erroneously and prejudicially refused to hear Mr. Joseph Nunan, a former Commissioner of Internal Revenue and a member of the bar, who had been subpoenaed by Rutkin to establish a connection between a civil suit brought by Rutkin against Reinfeld in 1948 and the indictment of Rutkin allegedly instigated by Reinfeld the following year. The court inquired, "[A]re you going to produce Nunan to show that Reinfeld lied at the trial?" Counsel for Rutkin admitted that Nunan could not establish that. The court then decided not to hear Nunan, stating that whatever was Reinfeld's motive in instigating, possibly, the indictment of Rutkin, the court would not presume that the Grand Jury acted corruptly in returning an indictment. Lacking direct proof of perjury by Reinfeld, Nunan's testimony would be ineffective to prove fraud.

Upon reading the transcript of the hearing in the court below, we are convinced that the court gave adequate consideration to Rutkin's motion. On the record before us we would be required, in effect, to disagree with Rutkin's conviction were we to find a fraud committed upon the court below. We cannot take this view. Cf. United States v. Johnson, 1946, 327 U.S. 106, 111–112, 66 S.Ct. 464, 90 L.Ed. 562. Rutkin's conviction has been affirmed by this court and by the Supreme Court of the United States and we are convinced that the judgment of conviction must stand.

The great difficulty which Rutkin faces is that the jury found him guilty. The jury elected to believe the evidence offered against him rather than that which was in his favor. It can be asserted, of course, as Rutkin asserts, that the jury reached the wrong conclusion but there was ample evidence on which to base the verdict of guilty. We cannot possibly say that the evidence offered by Frayne and Zimmy is of such a nature and character that on a new trial it would probably produce an acquittal.

All other issues and points raised by Rutkin do not merit discussion herein.

The order of the court below denying Rutkin's motion for a new trial will be affirmed.

KALODNER, Circuit Judge (dissenting).

The majority's disposition recalls to mind an incident which transpired during the tragic depression days in the early 1930's when bank closings were epidemic throughout the land. The payee of a check which had been returned marked "Insufficient Funds" stormed into the offices of the drawer of the check and indignantly demanded an explanation. The equally outraged drawer thereupon telephoned the bank and demanded an explanation in view of the fact that he had a substantial balance. Came this soothing reply from the bank's cashier: "Calm yourself, sir, calm yourself, when we returned your check marked 'insufficient funds' we did not mean you had insufficient funds; we meant we had insufficient funds."

And so here I agree with the majority that the instant appeal also presents a

question of "insufficiency" but part company with it on the score as to who is guilty of the "insufficiency". The majority takes the view that the "question * * * is whether the *showing made by Rutkin* on his motion for a new trial is *sufficient* to require * * *" its granting.[1] I take the view that the single issue for determination is whether Rutkin had been given a *"sufficient" hearing* by the District Court. On that score I am of the opinion that the record overwhelmingly established that Rutkin had not been given a "sufficient" hearing and that the District Court acted in abuse of its discretion in failing to give him such a hearing and that accordingly its denial of the motion for a new trial must be reversed with directions to give Rutkin a hearing in accordance with established practices of judicial decorum. In connection with the latter statement I desire to emphasize that the primary reason for my dissent is my grave concern that the affirmance by this Court of the District Court's denial of Rutkin's motion for a new trial may be construed as our giving sanction to its patent abuse of legal discretion, although the majority has in fact premised its disposition solely on its view that Frayne's proffered newly-discovered evidence is cumulative under applicable legal principles. On the latter score I disagree with the majority for the reasons subsequently stated but again I stress that such disagreement is wholly subsidiary to the single paramount issue as to whether the District Court acted in abuse of its discretion.

Indeed the majority's position is truly an anomalous one since, after noting that "* * * *the court below refused to allow Frayne to give oral testimony or to be examined upon his affidavit"*, and further "* * * *the court below heard statements by the Assistant United States Attorney, unsupported by any proof, which tended to challenge Frayne's veracity"*, and stating its conclusion "* * * *that the procedure at the hearing below"* was *"summary"*, it nevertheless proceeded to affirm the District Court's denial of Rutkin's motion. (Emphasis supplied.)

It is regrettable that the majority did not set out in further detail what transpired at the hearing on the motion for a new trial. Not only was Tyne, the Assistant United States Attorney, permitted to challenge Frayne's veracity, but he was also permitted, in extraordinary and unorthodox manner, to castigate Frayne as "a paid informer" and to state that "We presently have Frayne under investigation now for a federal offense" and "This affidavit of Frayne's is fraught with suspicion." Further, Tyne was permitted to question one William O'Donald, Special Agent for the Internal Revenue Bureau, who was seated in the court room, with reference to an alleged conversation which he had with Frayne prior to the trial, although O'Donald was not called to the witness stand or sworn. Subsequently the District Court denied application by Rutkin's counsel for leave to call Frayne and O'Donald to the witness stand and to examine them with respect to Tyne's and O'Donald's statements.

Under the facts as stated I cannot subscribe to the majority's holding that "upon reading the transcript of the hearing in the court below, we are convinced that the court gave adequate consideration to Rutkin's motion."

The majority's affirmance of the District Court's denial of Rutkin's motion for a new trial was premised on its view that Frayne's proffered after-discovered evidence was "merely cumulative and impeaching and was not of such a character as would probably lead to acquittal at a new trial."

Inherent in the majority's expression on this point is its holding that evidence is to be inexorably classified as "merely cumulative" when it is repetitious of testimony already received.

1. "The question now before us is whether the showing made by Rutkin on his motion for a new trial is sufficient to require that the jury verdict be set aside and Rutkin tried again."

That holding is at variance with well-settled principles which may be stated as follows:

The test whether evidence is cumulative is not whether it tends to establish the same fact, but rather whether it is different in kind, quality or grade.[2] New evidence of a higher grade or character should not be classified as merely cumulative.[3] Evidence of disinterested witnesses although repetitious of that given by an interested party is evidence of "another character" and "in justice the two classes of testimony should be distinguished, and the defendant should have the benefit of the declarations of disinterested witnesses."[4] The criterion to be applied is whether the new evidence, notwithstanding its cumulative character, "possesses sufficient probative force to render probable a different result upon a retrial of the case"; if it does, "it will then warrant and require an order granting a new trial."[5]

In applying the principles stated it is imperative to keep in focus (1) the critical issue at the original trial; (2) the source, grade and quality of the testimony there submitted; (3) the quality and grade of Frayne's newly-discovered evidence and (4) the probable effect of the latter evidence upon a retrial of the case.

The critical issue at the trial was whether Rutkin had been Reinfeld's partner in the Browne Vintners venture and had received $250,000 as his due share of the profits therein or had "extorted" the $250,000 by threats on Reinfeld's life.

All the witnesses who testified at the trial as to Rutkin's status in Browne Vintners were in some degree interested parties. Rutkin, of course, as a party defendant had the greatest interest in the outcome of the litigation. As to the other witnesses; Bennett had been an officer of Browne Vintners; Joseph Da-

**2.** "The true test as to whether evidence is cumulative depends not only on whether it tends to establish the same fact, but it may depend on whether the new evidence is of the same or different grade." Perry v. Hammock, 1947, 75 Ga.App. 171, 42 S.E.2d 651, 653. See also Bradley v. Kelley, 1933, 105 Vt. 478, 168 A. 554; Harris v. Jay, 1930, 92 Ind.App. 543, 174 N.E. 107.

**3.** Van Meter v. Beckers, Mo.App., 1931, 42 S.W.2d 951; Foster v. Rosamond, 1937, 28 Ala.App. 99, 180 So. 334.

**4.** State v. Evans, 1920, 98 Or. 214, 192 P. 1062, 1067, 193 P. 927. In that case the Court said: " * * * it is plain common sense that the evidence of disinterested witnesses would be evidence of another character, differentiated by its very disinterestedness from the testimony of the defendant himself, which confessedly is from the mouth of a witness interested in his own behalf. It is therefore not evidence of the same character. In justice the two classes of testimony should be distinguished, and the defendant should have the benefit of the declarations of disinterested witnesses." To the same effect see People v. O'Brien, 1905, 110 App. Div. 26, 96 N.Y.S. 1045. There a defendant, convicted of robbery, sought a new trial for the purpose of introducing dis-interested witnesses. The Court held that a new trial was justified, stating such evidence was not cumulative, inasmuch as it was not of the quality of that adduced at the trial, namely, that of other persons jointly indicted with the defendant. See also State v. McKean, 1922, 46 S.D. 85, 190 N.W. 781; Wisniewski v. Wysocki, Sup., 1942, 36 N.Y.S.2d 712; State v. Wiley, 1917, 106 S.C. 437, 91 S.E. 382 and Spencer v. State, 1913, 69 Tex.Cr.R. 92, 153 S.W. 858, 46 L.R.A.,N.S., 903.

**5.** Meinberg v. Jordan, 1916, 29 Cal.App. 760, 157 P. 1005, 1007. A similar view was expressed in Markert v. Long Island R. Co., 1916, 175 App.Div. 467, 161 N.Y. S. 926, 929, where the Court said: "The strict rule with respect to cumulative evidence which was formerly applied on such applications no longer obtains, and it is now well settled that the rule with respect to cumulative evidence (from a disinterested witness), to be applied on a motion for a new trial on the ground of newly discovered evidence, *whether the newly discovered evidence is cumulative or not, is: 'Is it of such a character that it is liable to produce a different result on a new trial?'* * * (emphasis supplied). See also Webster v. Ek, 1932, 62 N.D. 44, 241 N.W. 503; Johnson v. Commonwealth, 1920, 188 Ky. 391, 222 S.W. 106.

vis, a former bootlegger, had been a shareholder and officer in Browne Vintners; Harry Davis, also a former bootlegger, had been a shareholder in Browne Vintners; and Samuel I. Kessler, whose brother had been a director in Browne Vintners, participated in conferences held in 1942 to resolve disputes as to the distribution of the proceeds received from the sale of Browne Vintners. Much of the testimony in the trial court was devoted to parading before the jurors the corrupt lives of Rutkin and his associates, ranging from bootlegging to bribery and gambling.

As the majority pointed out, the trial judge stated that it was obvious that perjury had been committed by one side or the other at the trial. The District Court at the hearing on Rutkin's motion for a new trial made a strikingly graphic analysis of the quality of the evidence at the trial and the caliber of the witnesses stating:

*"The whole trial was filled with fantastic evidence, incredible evidence, evidence that if I had any hair would make it stand on end. And we wern't dealing with a lot of good, church-going, moral individuals."* (Emphasis supplied.)

And at still another point in the same hearing the District Court stated:

"Reinfeld is no lily; Reinfeld started out and by corrupt, dishonest, thieving methods built up a tremendous fortune * * *. I think he stands as a living monument to what corruption can do."

Four members of the United States Supreme Court in the dissenting opinion in Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 [6] heartily subscribed to the District Court's characterization of the testimony as "fantastic evidence, incredible evidence." Speaking through Mr. Justice Black they characterized Reinfeld's

testimony and that of supporting witnesses as a "fantastic story of supposed extortion". 343 U.S. at page 147, 72 S. Ct. at page 580.

The offer of Frayne's newly-discovered evidence must be considered in the light of the background of the record at the trial. The substance of his evidence is that Reinfeld told him that Rutkin was his partner in the Browne Vintners venture and that he would receive a substantial share of the profits therein. This, of course, is in direct contradiction to Reinfeld's testimony at the trial that Rutkin was not his partner.

It is Rutkin's contention that because of the fact that Frayne was for many years a respected and responsible government employee that his testimony might well serve to bring about his acquittal at a new trial. It is not disputed that Frayne was for years an Assistant Special Agent in Charge of the Department of Justice, Special Agency and Coordination Service in Charge of New York, New Jersey, Connecticut, Puerto Rico and the Virgin Islands and Chief of the Fugitive Squad, Bureau of Internal Revenue. In his official capacity it was his duty to know law violators in his district and he knew Rutkin and Reinfeld when they were engaged in smuggling alcohol and bootlegging during Prohibition days and thereafter. His testimony as a disinterested witness is certainly to be regarded as different in kind, quality and grade from that of the witnesses heard at the original trial —witnesses who were so vividly characterized by the District Court in its statement: "We weren't dealing with a lot of good, church-going, moral individuals."

If the jury believed Frayne's testimony to be true it would certainly accord to it greater probative value than that of the ill-assorted lot of witnesses heard at the trial.[7] That circumstance

6. The principal issue in Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 572, was "whether money obtained by extortion is income taxable to the extortioner under § 22(a) of the Internal Revenue Code [26 U.S.C.A. § 22(a)]."

7. In support of its conclusion that Frayne's proffered testimony was "merely cumula-

could well result in Rutkin's acquittal at a retrial. Indeed the majority recognized that fact when it stated that Reinfeld's "admissions (of Rutkin's partnership interest in the Browne Vintners venture as sworn to by Frayne in his affidavit), if true, would tend to contradict Reinfeld's testimony at Rutkin's trial and *to destroy Reinfeld's credibility*." (Emphasis supplied.)

It is impossible to reconcile this statement with the majority's further statement that "We cannot possibly say that the evidence offered by Frayne * * * is of such a nature and character that on a new trial it would probably produce an acquittal."

It is likewise impossible to reconcile the majority's finding that the District Court "gave adequate consideration to Rutkin's motion" with its finding that the proceedings before the District Court were conducted in "summary" manner.

tive" the majority has laid great stress upon the testimony at the original trial of Kessler and other witnesses who were partners in the Browne Vintners deal.

As to Kessler:

The majority stated: "He (Kessler) testified that Reinfeld agreed to pay Rutkin $250,000 in settlement of the latter's alleged interest in the (Browne Vintners) enterprise."

There simply is no basis in the record for that statement; at no time did Kessler testify that Reinfeld had ever admitted, indicated or intimated that Rutkin had an interest in the Browne Vintners venture. All that Kessler ever testified was that Reinfeld had stated that *Rutkin was claiming* an interest in the Browne Vintners enterprise. That indeed is a far cry from an admission by Reinfeld that Rutkin did have such an interest. It is a far cry too from Frayne's newly-discovered evidence that Reinfeld had directly admitted that Rutkin was his partner in the Browne Vintners transaction.

It must be noted that the majority has

Dwarfing the question as to whether Frayne's newly-discovered evidence entitled Rutkin to a new trial is the vitally important issue as to whether the District Court abused its discretion in its conduct of Rutkin's motion for a new trial.

Since the record incontrovertibly established that the District Court's conduct was "summary", a reversal is mandatory.

### On Petition for Rehearing

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

PER CURIAM.

An examination of the petition for rehearing discloses no point which was not considered by the court. The petition for rehearing therefore will be denied.

KALODNER, Circuit Judge, dissents.

pioneered a startling new concept in the law of evidence—"the equivalent of admissions"—as evidenced by its statement: "These excerpts from the evidence at Rutkin's trial are the equivalent of admissions by Reinfeld of Rutkin's interest in Browne Vintners and of Rutkin's right to receive part of the proceeds of the sale."

Assuming for the sake of argument the existence of a doctrine of "the equivalent of admissions" it would be ignoring the facts of life to say that the application of such an academic doctrine in the give-and-take atmosphere of a criminal trial would have the impact on a jury of direct testimony that Reinfeld had admitted Rutkin was his partner.

As to the other witnesses whose testimony was adverted to by the majority:

It would serve no useful purpose to analyze their testimony in minute detail. It is only necessary to say that not a single one of these witnesses testified that Reinfeld had ever admitted that Rutkin was his partner in Browne Vintners as Frayne offered to testify.